## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ASI BUSINESS SOLUTIONS, INC.** | : | **CIVIL ACTION** |
| **2200 Renaissance Boulevard** | : | |
| **King of Prussia, PA 19406,** | : | |
| | : | **No.** _____ |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **OTSUKA AMERICA** | : | |
| **PHARMACEUTICAL, INC.** | : | |
| **508 Carnegie Center** | : | |
| **Princeton, NJ 08540** | : | |
| | : | |
| **Defendant.** | : | |

### VERIFIED COMPLAINT

Plaintiff ASI Business Solutions, Inc. ("ASI"), through its undersigned attorneys, avers as follows:

### Nature of Action

1.    ASI commences this action for a temporary restraining order and preliminary and permanent injunction relief (1) to compel defendant Otsuka America Pharmaceutical, Inc. ("Otsuka") to comply with its contractual obligations to remove and/or destroy software from its computer systems and (2) to prohibit Otsuka's unauthorized use and disclosure of ASI's confidential, proprietary, and trade secret computer software based on breaches of contractual obligations, violations of the Defend Trade Secret Act, 18 U.S.C. § 1831, et seq., and violations of the Pennsylvania Uniform Trade Secret Act, 12 Pa. C.S.A. § 5301, et seq.

### The Parties

2.    Plaintiff ASI is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 2200 Renaissance

Boulevard, King of Prussia, Pennsylvania 19406. ASI is a citizen of the Commonwealth of Pennsylvania.

3.    Defendant Otsuka is a corporation organized and existing under the laws of the State of Maryland with its principal place of business at 508 Carnegie Center, Princeton, New Jersey, 08540. Otsuka is a citizen of the State of Maryland and/or the State of New Jersey.

## Jurisdiction and Venue

4.    This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on ASI's claims for violations of the Defend Secret Act, 18 U.S.C. § 1831, et seq. This Court has pendent jurisdiction over ASI's state-law claims. Additionally, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship between the plaintiff and the defendant and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

## Factual Background

6.    ASI engages in the business of developing, licensing for use, and implementing relationship management software, including but not limited to ASI Reward™, ASI Inquire®, ASI e-Pharma Today™, ASI Console®, ASI Realignment Manager™, ASI Segmentation Analyzer™, ASI Investigator Portfolio™, and providing professional services related to such software. ASI also engages in the business of providing help desk, environment hosting, technical support, and systems operations services, Application Solution Provider solutions such as PharmaServ®, Vertical Enterprise Portal solutions such as ePharma-Rx™, and other information technology services and solutions on a subscription basis.

-2-

7.     ASI expends substantial time, money, and energy in developing its software and related technology and services.  As a result, ASI's software information technology services and solutions are unique in the industry and provide it with a competitive advantage over other companies in this line of business.

8.     ASI's confidential, proprietary, and trade secret information, including its trade secret software, is regularly used in interstate commerce.

9.     ASI's various software products constitute valuable trade secrets, which ASI licenses to numerous companies for millions of dollars per year.

10.    If ASI's software were provided to other software developers, those developers could ascertain ASI's trade secrets, something that would cause immediate and irreparable harm to ASI's business.

11.    Because ASI's trade secret software is highly valuable, ASI protects its confidentiality by (a) protecting the source code from unauthorized access by third parties; (b) limiting its employees who have access to the software source code; (c) allowing its authorized employees to access its systems only by using authorized usernames and passcodes; (d) requiring its employees to enter into confidentiality and non-disclosure agreements; and (e) licensing its software only to those companies that agree to maintain the confidentiality of ASI's software, not to disclose ASI's software to third parties without ASI's prior, written permission, and to destroy or remove its software after the termination of the license agreement.

12.    Otsuka engages in the research and clinical development of healthcare products. Otsuka develops new treatments and indications focusing on neuroscience, oncology, hospital,

-3-

and medical device areas for diseases.  It also develops drug candidates and conducts clinical studies in various pharmaceutical areas.

13.     In or about the fall of 2010, Otsuka contacted ASI and expressed interest in licensing certain ASI software to optimize its sales through the management of its sales force.

14.     On November 1, 2010, ASI and Otsuka entered into a Master Subscription Services Agreement (the "Agreement"), attached hereto as Exhibit A.

15.     In conjunction with entering into the Agreement, ASI and Otsuka entered into Appendix A 1–3,  Software Upgrade and Support Addendum (Exhibit B hereto), Appendix B 1–3, Subscription Services Addendum (Exhibit C hereto), and Appendix B 1–4 (Exhibit D hereto). Appendix A 1–3, Appendix B 1–3, and Appendix B 1–4 are collectively referred to as the "Appendices."

16.     Under the Agreement, ASI agrees to license Subscription Services, identified in the Appendices, on a non-exclusive, right-to-use basis, only at Otsuka's identified facilities.  See Agreement, § 3(a) (Exhibit A).

17.     The Agreement prohibits Otsuka from copying, relocating, moving, sublicensing, renting, timesharing, loaning, leasing, or distributing the software products it obtains under the Agreement.  See Agreement, § 3(b) (Exhibit A).

18.     The Agreement further prohibits Otsuka from operating the Subscription Service for the benefit of any third party without ASI's prior written consent and makes any attempt to do so void.  See Agreement, § 3(b) (Exhibit A).

-4-

19.     In the Agreement, Otsuka acknowledges that all of ASI's materials and information relating to its products, services, and sales, are considered to be "ASI Confidential Information." ASI Confidential Information includes ASI's software. See Agreement, § 10(a).

20.     Otsuka agrees not to disclose ASI Confidential Information to third parties or use ASI Confidential Information without ASI's permission. See Agreement, § 10(b). Otsuka further agrees to limit the disclosure of ASI Confidential Information to those persons within its company who need to know such confidential information. Id.

21.     Under the Agreement and the Appendices, Otsuka agrees to license ASI's products and services from January 1, 2012 to January 31, 2017.

22.     Otsuka installed ASI trade secrets software on numerous computers and devices, which are accessible by Otsuka employees.

23.     In or about December 2015, Otsuka opted to terminate the Agreement before the agreed-upon termination date. Otsuka paid ASI an early termination fee of over $2 million.

24.     Upon information and belief, Otsuka hired Genpact, a third party software developer, to develop an alternative to ASI's software and related services.

25.     Otsuka and ASI originally agreed that the early termination date for the Agreement would be June 4, 2016; however, Otsuka's alternative software was not ready by the date. Otsuka paid ASI $175,000 to extend the early termination date to July 4, 2016; an additional $175,000 to extend the early termination date to August 4, 2016; and an additional $175,000 to extend the early termination date to September 4, 2016.

26.     As of the September 4, 2016 termination date, Otsuka was required to cease using and accessing the Subscription Services, including ASI's trade secret software. See Appendix A

1 –3, § 8(a)(iii)(Exhibit B);  Appendix B 1–3, Section 6(a)(iii) (Exhibit C), and Appendix B 1–4, § 6(a)(ii) (Exhibit D).

27.    Upon the termination of the Agreement, Otsuka is also required to promptly deliver to ASI all ASI Confidential Information and other materials, including preliminary outlines, notes, sketches, plans, unpublished memoranda, and other documents or destroy all ASI Confidential Information and deliver a written statement certifying the destruction, signed by an appropriate officer of Otsuka.  See Agreement, § 10(e) (Exhibit A).

28.    Notwithstanding the unambiguous provisions of the Agreement requiring Otsuka to deliver ASI Confidential Information to ASI or alternatively to destroy ASI Confidential Information and certify its destruction, Otsuka has failed to do so.

29.    Subsequent to the September 4, 2016 termination date, Otsuka continued to use ASI's trade secret software.  Specifically, ASI continued to receive approximately 100 system access requests from various Otsuka devices on which ASI software was installed.

30.    Otsuka could only make system-access requests by using ASI Confidential Information, which it covenanted not to use after the termination of the Agreement.  Otsuka's attempts to access ASI's system also evidences Otsuka's failure to destroy ASI Confidential Information as required by § 10(e) of the Agreement.

31.    Otsuka's unauthorized use of ASI's trade secrets software constitutes breaches of its contractual obligations, violations of the federal Defend Trade Secret, and violations of Pennsylvania's Uniform Trade Secret Act.

32.    When ASI reminded Otsuka of its obligations to return or destroy ASI Confidential Information, Otsuka responded on September 26, 2016 by merely certifying that it

-6-

"has ceased using and accessing the Subscription Service" and it "has used reasonable business efforts to confirm removal of any ASI Confidential Information, including Intellectual Property." A true and correct copy of Otsuka's certification is attached hereto as Exhibit E.

33.     Otsuka's certification that it "has used reasonable business efforts to confirm removal of any ASI Confidential Information" does not fulfill Otsuka's obligations under the Agreement.

34.     Upon information and belief, Otsuka is a large, billion dollar corporation that has a sophisticated information technology department, whose employees have the necessary expertise to remove and permanently destroy all ASI Confidential Information from Otsuka's computer systems.

35.     After Otsuka certified to ASI that it "had used reasonable business efforts to confirm removal of any ASI Confidential Information" on September 26, 2016, Otsuka continued to use ASI's software to make system-access requests to ASI.

36.     Otsuka also has the ability to use ASI's trade secret software locally, in a manner that does not trigger system-access requests to ASI.

37.     Otsuka's continued use of ASI's software after September 26, 2016 constitutes breaches of its contractual obligations, violations of the federal Defend Trade Secret Act, had Pennsylvania's Uniform Trade Secret Act.

38.     After being informed that Otsuka would only use "reasonable business efforts" to destroy ASI Confidential Information, ASI's counsel wrote to Otsuka October 3, 2016, reiterating the importance of this § 10(e) to ASI.  ASI's counsel requested Otsuka to comply with § 10(e) of the Agreement, § 8(a)(iii) of Appendix A 1–3, § 6(a)(ii) of Appendix B 1–3, and

-7-

§ 6(a)(ii) of Appendix B 1–4 no later than October 7, 2016. A true and correct copy of ASI's counsel's letter to Otsuka is attached hereto as Exhibit F.

39.      Otsuka never responded to the October 3, 2016 letter from ASI's counsel and to date has failed to certify that it has removed ASI Confidential Information from all of its computers and devices.

40.      Upon information and belief, Otsuka is improperly allowing its software developer, Genpact, to access ASI Confidential Information. Otsuka retained Genpact to replace the ASI trade secret software licensed to Otsuka under the Agreement and the Appendices. Because ASI's software is still believed to be on Otsuka's computers and devices, Otsuka and Genpact have access to ASI Confidential Information in violation of the Agreement and the Pennsylvania Uniform Trade Secret Act.

41.      Otsuka has previously granted a third party software developer access to ASI's trade secrets software contrary to the authorization that it received from ASI. In 2015, Otsuka granted Mu Sigma, a third party software developer, access to executables in ASI's software even though ASI did not grant Otsuka permission to do so. Mu Sigma, which is located in India, attempted on multiple occasions to access ASI's system using ASI's trade secrets software.

42.      Based on Otsuka's prior, unauthorized disclosure of ASI Confidential Information to Mu Sigma, Otsuka's retention of a software developer to replace ASI's trade secrets software, and Otsuka's failure to abide by basic provisions of the Agreement, ASI has grave concerns that its confidential information has been or will imminently be disclosed to Genpact.

17931021v.2

43.     Otsuka's failure to return or certify the destruction of ASI Confidential Information constitutes material breaches of the Agreement, violations of the federal Defend Trade Secret Act, and violations of the Pennsylvania Uniform Trade Secret Act.

44.     Otsuka's unauthorized use and disclosure of ASI Confidential Information, including ASI's trade secret software, after the September 4, 2016 termination date constitutes material breaches of the Agreement, violations of the federal Defend Trade Secret Act, and violations of the Pennsylvania Uniform Trade Secret Act.

45.     If Otsuka is permitted to retain and use ASI Confidential Information and/or to disclose ASI Confidential Information to third parties, ASI will suffer immediate and irreparable harm through the unauthorized use and disclosure of its confidential, proprietary, and trade secret information by Otsuka and one or more third-party software developers that directly compete with ASI.

46.     ASI's rights to relief are clear under the Agreement, the Appendices, the federal Defend Trade Secret Act, and the Pennsylvania Uniform Trade Secret Act.

47.     ASI will sustain irreparable harm if no injunctive relief is granted. Otsuka will sustain no harm if compelled to comply with the Agreement and Appendices and prohibited from continuing to use and disclose ASI Confidential Information.

48.     The public interest lies in enforcing agreements and statutory trade secret law aimed at protecting companies like ASI, which invest substantial time, money, and energy in developing trade secrets.

17931021v.2

49.     ASI is entitled to attorneys' fees for Otsuka's breaches of the Agreement, violations of the federal Defend Trade Secret Act, and violations of Pennsylvania's Uniform Trade Secret Act.

50.     ASI also believes that it may also have sustained monetary damages as a result of the unlawful actions Otsuka and others hired by Otsuka.  Under the Agreement, the parties are required to arbitrate claims for monetary damages.  See Agreement, § 15 (Exhibit A). Accordingly, this Court does not have subject matter jurisdiction to hear those claims at law, and ASI does not present them here.

WHEREFORE, for the foregoing reasons, ASI requests this Court to enter a temporary restraining order and preliminary and permanent injunctive relief:

(a)     requiring Otsuka to return or destroy and certify the destruction of all ASI Confidential Information in accordance with the terms of the Agreement;

(b)     prohibiting Otsuka from using any ASI Confidential Information;

(c)     requiring Otsuka to disclose all third parties to whom it disclosed ASI Confidential Information;

(d)     requiring all third parties that have obtained ASI Confidential Information from Otsuka to immediately return all such confidential information to ASI;

(e)     prohibiting Otsuka from using any software developed by Genpact or any other software developers based on unauthorized use and disclosure of ASI Confidential Information; and

(f)   awarding ASI costs and attorneys' fees as permitted by applicable law.

Respectfully submitted,

WHITE AND WILLIAMS LLP

Thomas B. Fiddler
One Liberty Place, Suite 1800
1650 Market Street
Philadelphia, PA  19103
(215) 864-7081

October 21, 2016

Attorneys for Plaintiff
ASI Business Solutions, Inc.

-11-

## VERIFICATION

I, JIM ALONSO, hereby verify that that the facts contained in the foregoing Verified Complaint are true and correct to the best of my knowledge, information and belief. I am authorized to make this Verification on behalf of plaintiff ASI Business Solutions, Inc. by virtue of my position as its Chief Executive Officer. I understand that this Verification is made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn falsification to authorities.

Dated: October 20, 2016

Printed Name: Jim Alonso

Title: CEO

17931021v.2

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Verified Complaint has been served via e-mail and Federal Express upon the following counsel of record on this 21st day of October, 2016:

> R. Monica Hennessy, Esquire
> Otsuka Pharmaceutical Development &Commercialization, Inc.
> 508 Carnegie Center Drive
> Princeton, NJ  08540
> Monica.Hennessey@otsuka-us.com

Thomas B. Fiddler

# EXHIBIT "A"



ASI BUSINESS SOLUTIONS, INC.
2200 RENAISSANCE BLVD.
KING OF PRUSSIA, PA 19406-2766
PHONE: (610) 265-9400
FAX: (610) 265-4100

DB#1065024

## MASTER SUBSCRIPTION SERVICE AGREEMENT

**THIS MASTER SUBSCRIPTION SERVICE AGREEMENT** (this "**Agreement**") is entered into this 1st day of November, 2010, by and between ASI Business Solutions, Inc. ("**ASI**"), a New Jersey corporation and Otsuka America Pharmaceutical Inc., a Maryland corporation ("**Customer**").

### BACKGROUND

WHEREAS, ASI is in the business of developing, licensing for use and implementing customer relationship management software such as ASI Reward™, ASI Inquire®, ASI e-PharmaToday™, ASI Console®, ASI Realignment Manager™, ASI Segmentation Analyzer™, ASI Compensation Analyzer™, ASI Investigator Portfolio™ and providing professional services related to such software;

WHEREAS, ASI is also in the business of providing help desk, environment hosting, technical support, and systems operation services; Application Solution Provider solutions such as PharmaServ®; Vertical Enterprise Portals solutions such as e-PharmaRx™ and other information technology services and solutions on a subscription basis; and

WHEREAS, Customer wishes to license and subscribe for some or all of the foregoing Software and Subscription Services under the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing premises and the mutual promises and covenants contained herein and intending to be legally bound, the parties hereby agree as follows:

1   **Definitions.**

    (a)   "**AAA**" means the American Arbitration Association.

    (b)   "**Access App**" means ASI iPharmaToday™ or any other application developed by or for ASI to access the Subscription Service(s) via an Apple iPhone®, Apple iPad®, or other internet enabled "app" based digital device.

    (c)   "**AMA**" means the American Medical Association.

    (d)   "**Commencement Date**" shall have the meaning given in Section 4(b).

    (e)   "**Confidential Information**" shall have the meaning given in Section 10(a).

    (f)   "**Dollar(s)**" or "**$**", means United States currency.

    (g)   "**Guidelines**" shall have the meaning given in Section 6(d).

    (h)   "**Initial Subscription Period**" shall have the meaning given in Section 4(b).

    (i)   "**License**" shall have the meaning given In Section 3(a).

    (j)   "**PDRP**" shall have the meaning given in Section 6(d).

    (k)   "**Sales Taxes**" shall have the meaning given In Section 12(e).

## MASTER SUBSCRIPTION SERVICE AGREEMENT

(l) "**Services**" means all of the services rendered by ASI pursuant to this Agreement.

(m) "**Software**" means the object code version of ASI commercially available software products, but does not include any Access App.

(n) "**Subscription Service Index**" means the original Subscription Service Index 1, together with all Appendices thereto, and each new Subscription Service Index, together with all Appendices thereto, that may hereafter be completed, executed and delivered pursuant to Section 2.

(o) "**Subscription Service(s)**" means (i) the information technology service(s) or solution(s) and (ii) the right to use license for the object code version the Software, in any case, as more particularly described and granted in a Subscription Service Index attached to this Agreement corresponding to such service, solution or Software.

(p) "**Term**" shall have the meaning given in Section 4(a).

(q) "**Use**" shall have the meaning given in Section 3(a).

(r) "**Users**" means concurrent end-users of the Subscription Service.

(s) "**User Documentation**" means the online user guide for explaining the use of the ASI Software products.

(t) "**Warranty Period**" shall have the meaning given in Section 6(a).

## 2   Election of Services.

Customer hereby subscribes to each Subscription Service selected on the Subscription Service Index.   In addition, Customer may from time to time subscribe to additional Subscription Services, provided that:

(a) both parties complete, execute and deliver the relevant Subscription Service Index for such Subscription Service;

(b) Customer has paid all previously invoiced Subscription Fees; and

(c) Customer pays ASI all relevant and current fees therefore, whereupon such new documentation shall become a supplement to this Agreement.

Purchase order or other business form or documentation of Customer shall not be considered part of this Agreement or an amendment or revision of this Agreement, whether or not such purchase order or business form or documentation is received, accepted, approved or signed by ASI.

## 3   License to Use Subscription Service.

(a) Grant of License.   With respect to each Subscription Service ordered by Customer pursuant to Section 2, ASI grants to Customer a non-exclusive, right-to-use license (each, a "**License**") to use (collectively, "**Use**") the Subscription Service and to make the Subscription Service available for Use at the facility or facilities, and by no more than the number of Users, listed in the applicable Appendix to the Subscription Service Index in support of Customer's internal business activities.   Customer may relocate the Subscription Service from the facility or facilities where it was originally installed and Use the Subscription Service at another facility or facilities; provided that Customer promptly notifies ASI of such relocation in writing and Uses the Subscription Service at

## MASTER SUBSCRIPTION SERVICE AGREEMENT

no more than the number of facilities, and by no more than the number of Users, listed in the applicable Appendix to the Subscription Service Index. Customer's Use of the Subscription Service shall be limited to the United States of America and its territories and possessions unless Appendix C, Enterprise Addendum, is marked as "Applicable" on the Subscription Service Index and executed by the parties and attached hereto.

(b) <u>Other Restrictions</u>.   Except as specifically authorized in another provision of this Agreement, Customer may not copy, relocate, move, sublicense, rent, timeshare, loan, lease, or otherwise distribute the Subscription Service to or operate the Subscription Service for the benefit of, any third party without ASI's prior written consent and any attempt to the contrary shall be void and of no legal effect.   Further restrictions are contained in Section 10 of this Agreement.   Customer shall not disassemble, decompile, reverse compile or reverse engineer the Software or the Subscription Service.

(c) <u>Backup Exception</u>.   Customer may make copies of the Subscription Service solely for archival/backup purposes.

(d) <u>Disaster Recovery Exception</u>.   In the event of disaster at a facility where Customer Uses the Subscription Service, Customer may temporarily relocate the Subscription Service from such facility and Use such Subscription Service at another facility; provided that Customer promptly notifies ASI of such relocation in writing and otherwise complies with its obligations under this Agreement.

**4     Term and Termination.**

(a) <u>Term of Agreement</u>.   This Agreement shall begin on the date first written above and shall remain in effect until terminated in accordance with this Section 4 or Section 12(b) (the "**Term**").

(b) <u>Term of Subscription Service</u>.   The term for each Subscription Service shall commence on the date set forth in the corresponding Subscription Service for such Subscription Service (each, a "**Commencement Date**") and shall expire in accordance with such Subscription Service (the "**Initial Subscription Period**").   Except as set forth in Section 4(d), Section 5(f), and Section 12(b), Subscription Services may not be canceled or terminated prior to the expiration of the Subscription Period for such Subscription Service.

(c) <u>Termination of Agreement</u>.   Provided that all Subscription Services have expired, either party may terminate this Agreement at any time by giving the other party ninety (90) days written notice of such termination.

(d) <u>For Breach</u>.   Either party may terminate this Agreement effective upon giving notice to the other party if the other party has materially breached this Agreement and the other party fails to cure such breach within thirty (30) days of receipt of notice of such breach. Notwithstanding anything to the contrary, ASI may suspend its performance of all Subscription Services if Customer does not remain current in its payments for any Subscription Service.

(e) <u>Effect of Termination</u>.   The termination of this Agreement shall have no effect on Customer's obligation to pay the applicable charges with respect to Subscription Services in effect prior to termination.   Sections 4, 6(c), and 7 through 15 (inclusive), 16(b), 16(h) and 16(i) shall survive the termination of this Agreement for any reason.

## MASTER SUBSCRIPTION SERVICE AGREEMENT

**5    Customer Corporate Integrity Agreement.**

    (a)   On March 25, 2008, Customer entered into a Corporate Integrity Agreement (CIA) with the Office of Inspector General of the Department of Health and Human Services to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs and with the statutes, regulations, and written directives of the Food and Drug Administration. Pursuant to this CIA, Customer requires the following from ASI:

        (i)    Compliance with Customer's Business Conduct Policy (BCP); and

        (ii)   Training on certain topics related to Customer's business

    (b)   ASI shall require all persons assigned to provide Services, including subcontractors, to read the Customer BCP, abide by BCP, and complete the BCP certification (last page of the BCP) within twenty-five (25) days of being assigned to provide Services.  The BCP can be found online at:

        www.otsuka-us.com/documents/CustomerBusinessConductPolicy.pdf

    (c)   ASI shall ensure that within twenty-five (25) days of notice and receipt of a new BCP all persons assigned to provide Services shall read the new BCP and complete a new BCP certification.

    (d)   ASI shall require all persons assigned to provide Services, including subcontractors, to complete the two modules of CIA-required training and to submit required training certificates to Customer within twenty-five (25) days of being assigned to provide Services.  CIA-required training shall be completed annually thereafter.   The two modules for CIA-required training are located at:

        www.otsuka-us.com/training/generaltraining/player.html

        www.otsuka-us.com/training/specifictraining/player.html

    (e)   All completed certifications required under this section shall be provided to Customer at eqccompliancetraining@otsuka-us.com and any questions regarding training can also be sent to this email address.

    (f)   Failure to complete satisfactorily any training or certification, pursuant to this section, shall be a basis for immediate termination of the Agreement.

**6    Limited Warranty; Infringement Indemnity.**

    (a)   <u>Limited Performance Warranty</u>.  ASI warrants to Customer that for a period of one hundred and eighty (180) days following the date on which the Software is first deployed by Customer for Customer's internal Use (the "**Warranty Period**") that ASI will make reasonable efforts to ensure that the Software operates substantially in accordance with the applicable User Documentation; provided that: (i) the Software is installed and operated in accordance with the User Documentation; (ii) Customer notifies ASI of any defect within ten (10) days after the appearance thereof; (iii) Customer has properly installed all releases made available by ASI with respect to the Software and updates recommended by ASI with respect to any third party software products (including operating system software) that materially affect the performance of the Software; (iv) Customer has properly maintained all associated equipment, software and environmental conditions in accordance with applicable specifications and industry standards; (v) Customer has not introduced other equipment or software creating an adverse impact on the Software; and (vi) Customer has paid all amounts

## MASTER SUBSCRIPTION SERVICE AGREEMENT

due hereunder and is not in default of any provision of this Agreement. ASI in no way warrants: (aa) that operation of the Software will be uninterrupted or error free; or (bb) the response time of the Software.

(b)     For Subscription Services other than Software, ASI shall perform all Subscription Services in a professional and workmanlike manner using only qualified staff.

(c)     EXCEPT AS SPECIFICALLY CONTAINED IN THIS SECTIONS 5(a), 5(b) and 5(e), ASI PROVIDES THE SUBSCRIPTION SERVICES TO CUSTOMER WITHOUT, AND ASI EXPRESSLY DISCLAIMS, ANY AND ALL OTHER WARRANTIES AND REPRESENTATIONS, WHETHER EXPRESS OR IMPLIED, WHETHER ARISING BY STATUTE OR OTHERWISE IN LAW OR FROM A COURSE OF DEALING OR USAGE OF TRADE, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OF ACCURACY, COMPLETENESS, PERFORMANCE, CURRENCY, MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE.

(d)     Customer acknowledges that, although certain of the Subscription Services may be intended to, among other things, assist Customer in complying with Prescribing Data Guidelines (the "**Guidelines**") published by the AMA and the AMA's Prescribing Data Restriction Program (along with the Guidelines, the "**PDRP**"), (i) compliance with the PDRP is the sole responsibility of Customer, (ii) the Subscription Service is only a component in Customer's comprehensive efforts to comply with the PDRP and (iii) the Subscription Service is provided to Customer subject to the limited product warranty and limitation of remedies and liabilities contained in this Agreement.

(e)     <u>Non-Infringement Indemnity</u>.  ASI shall indemnify and defend Customer against any claim that any of the Subscription Service(s) infringes any United States copyright; <u>provided that</u>: (i) the claimed infringement does not relate to, or result from, Customer's or any third party's modification(s) of the Subscription Service or use of the Subscription Service in combination with software or hardware not supplied or expressly approved in writing by ASI; and (ii) Customer gives ASI prompt, written notice of any such claim and allows ASI to control the defense and all related settlement negotiations.  If any infringement claim has occurred or in ASI's reasonable judgment is likely to occur and ASI is required to indemnify and defend Customer by virtue of the foregoing sentence, then Customer shall allow ASI, at ASI's option and expense, to procure the right for Customer to continue using the Subscription Service that is the subject of such claim, or to replace or modify such Subscription Service so that such Subscription Service becomes non-infringing yet remains functionally equivalent.  If neither of the foregoing alternatives is available on terms that are, in ASI's sole discretion, reasonable, then Customer shall, upon the request of ASI, return the Subscription Service to ASI and cease Use and access to the Subscription Service, whereupon ASI shall return to Customer an equitable portion of the Subscription Fees paid by Customer for such Subscription Service.  This Section 6(e) states Customer's sole and exclusive remedy arising from copyright infringement claims made against Customer with respect to the Subscription Service, and ASI shall incur no liability to Customer relating to such infringement claims except as provided in this Section 6(e).

7     <u>Limited Remedy</u>.

Customer's sole and exclusive remedy for any damage or loss in any way connected with ASI's breach, whether by ASI's breach of warranty, negligence or breach of any other duty, shall be, at ASI's option, re-performance of the relevant Subscription Service or a refund of the fee paid by Customer for the relevant Subscription Service in the period in which the default occurred.

## MASTER SUBSCRIPTION SERVICE AGREEMENT

8    **Limitation of Liability.**

(a)    <u>General.</u>   IN NO EVENT SHALL ASI'S LIABILITY, IN THE AGGREGATE, TO CUSTOMER OR ANY OTHER PERSON OR ENTITY FOR DAMAGES ARISING OUT OF THIS AGREEMENT, WHETHER IN TORT, CONTRACT OR OTHERWISE, EXCEED THE TOTAL SUBSCRIPTION FEES PAID BY CUSTOMER FOR THE RELEVANT SUBSCRIPTION SERVICE INITIAL SUBSCRIPTION PERIOD.

(b)    <u>Consequential Damages, Etc.</u>  ASI SHALL NOT BE LIABLE TO CUSTOMER OR ANY OTHER PERSON OR ENTITY FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE, SPECIAL, OR SIMILAR DAMAGES, INCLUDING, WITHOUT LIMITATION, LOST PROFITS, DAMAGES FOR LOSS OF GOODWILL, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, LOSS OF WORK PRODUCT, OR ANY AND ALL OTHER COMMERCIAL DAMAGES OR LOSSES, WHETHER DIRECTLY OR INDIRECTLY CAUSED, WHETHER IN TORT, CONTRACT, OR OTHERWISE, EVEN IF ASI IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. ("CONSEQUENTIAL DAMAGES").

(c)    <u>Additional Limitations for Customer Data Loss.</u>  CUSTOMER RECOGNIZES THAT IN CONNECTION WITH SOME OR ALL OF THE SUBSCRIPTION SERVICES CUSTOMER'S DATA IS INTENDED TO BE UPLOADED FROM THE CUSTOMER VIA THE INTERNET TO ASI AND STORED ON ASI'S SERVERS. CUSTOMER FURTHER ACKNOWLEDGES AND AGREES THAT IT IS SOLELY CUSTOMER'S OBLIGATION TO ENSURE THAT SUCH DATA IS UPLOADED TO ASI (WHETHER THROUGH A PERSONAL COMPUTER, ACCESS APP OR OTHER SUPPORTED METHOD), AND THAT ASI SHALL HAVE NO LIABILITY OF ANY KIND, WHETHER IN TORT, CONTRACT, OR OTHERWISE, INCLUDING (WITHOUT LIMITATION) ANY CONSEQUENTIAL DAMAGES RELATED TO CUSTOMER'S DATA OR ANY LOSS THEREOF UNLESS AND UNTIL SUCH DATA HAS BEEN RECEIVED BY ASI, AND THEN ONLY TO THE EXTENT AS EXPRESSLY LIMITED ABOVE.

9    **Intellectual Property Rights.**

All intellectual property rights that arise by virtue of ASI's performance under this Agreement, including, without limitation, all know-how, copyrights, trade secrets, patents and other proprietary rights, shall vest in and remain in ASI, except that ASI may, on a case-by-case basis, agree to a different arrangement, which arrangement shall be in writing signed by ASI and Customer.

10   **Confidentiality.**

(a)    ASI and Customer acknowledge that each party may receive or have access to confidential materials and information of the other party, both written and oral.  All such materials and information (including without limitation technical, scientific, financial, strategic, marketing or product information), if marked confidential or treated as confidential by the disclosing party, are collectively defined as **"Confidential Information"** and constitute the exclusive property of the disclosing party.  All materials and information relating to ASI's products, services, and sales shall hereby be deemed ASI's Confidential Information.

(b)    To protect this Confidential Information, during the Term and for five (5) years after the Term, the parties shall not use (except to perform and use the Subscription Services) or disclose to third parties any Confidential Information of the other party without the other party's prior written consent.  Furthermore, when use of Confidential Information is permitted under this Section 10(b) to perform and use the Subscription Services, the

## MASTER SUBSCRIPTION SERVICE AGREEMENT

parties agree to limit such disclosure to those persons within their respective organizations who need to know such Confidential Information.

(c)   The confidentiality obligations set forth in Section 10(b) shall not apply to a party's Confidential Information that:

   (i)   becomes public knowledge prior to or after the time of disclosure through no fault of the other party;

   (ii)   was in the other party's possession prior to disclosure by the party with respect to which such Confidential Information pertains (as evidenced by written records of the other party pre-dating such disclosure); or

   (iii)   becomes available to the other party from another source without any limitations on it, provided that such Confidential Information was not obtained by such source, directly or indirectly, from the party with respect to which such Confidential Information pertains.

(d)   Upon request, the parties shall cause their respective employees, subcontractors and agents involved in the performance of this Agreement to sign individual secrecy agreements binding them to the same obligations of confidentiality as provided herein. At the request of a party, the other party shall certify in writing that it has complied with the previous sentence.

(e)   Upon the termination of this Agreement or at any other time upon written request, each party shall: i) promptly deliver to the other party all Confidential Information and any other materials (including preliminary outlines, notes, sketches, plans, unpublished memoranda, and other documents) provided by, or prepared for, the other party under this Agreement containing Confidential Information; or ii) destroy such Confidential Information and deliver a certificate certifying the destruction signed by an appropriate officer of the party.  Neither party may retain copies of any such items without the other party's prior written consent.

(f)   In the event that receiving party is required by law or legal process (such as interrogatories, requests for information or documents in a court or administrative proceeding, subpoena, civil investigative demand or other similar process) to disclose any Confidential Information, receiving party will endeavor in good faith to provide disclosing party prompt notice of any such request or requirement so that disclosing party may, at disclosing party's expense, seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement.  If, in the absence of a protective order or other similar remedy or the receipt of a waiver from disclosing party, receiving party's counsel, in a written opinion, determines that disclosure of Confidential Information is required to comply with such process or applicable law, receiving party may, without liability under this Agreement, disclose to the appropriate authority only that portion of the Confidential Information that, on advice of counsel, it is required to disclose; provided that receiving party uses reasonable efforts to preserve the confidentiality of the disclosed Confidential Information including, without limitation, by cooperating with disclosing party, at disclosing party's expense, to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded to the disclosed Confidential Information.

## 11   Non-Solicitation.

During the Term and for a period of two (2) years after the Term, Customer shall not hire, solicit, or attempt to solicit the services of any employee or contractor of ASI without the prior written consent of ASI.  Violation of this provision shall entitle ASI to receive from Customer,

<u>MASTER SUBSCRIPTION SERVICE AGREEMENT</u>

as liquidated damages, an amount equal to two hundred percent (200%) of the solicited person's annual compensation.

12   <u>Prices and Payments.</u>

   (a)   The applicable Appendix to the Subscription Services Index sets forth the fees for a given period (the "**Subscription Fees**"). ASI shall invoice Customer for the Subscription Fees in accordance with the applicable Appendix to the Subscription Service Index, and Customer shall pay ASI such invoice within thirty (30) days of the invoice date. Customer may not withhold or "setoff" any amounts due hereunder.

   (b)   Notwithstanding anything contained to the contrary in this Agreement or in any other document or instrument executed or delivered in connection herewith: In the event that at any time during the Term the average increase in the CPI (hereafter defined) for the then elapsed portion of the Term exceeds six percent (6%), ASI may, at its option, propose an increase to the Subscription Fees then in effect by sending written notice of such proposed adjusted Subscription Fees to Customer ("**Proposed Adjustment Notice**"). Customer shall have the right to object to such proposed adjusted Subscription Fees by sending ASI written notice of the same within 30 days of receipt of the Proposed Adjustment Notice. Unless Customer shall have notified ASI in writing that it objects to such adjusted Subscription Fees within such 30 day period, Customer will be deemed to have accepted such adjusted Subscription Fees ("**Deemed Acceptance Date**"). In the event that Customer rejects such proposed adjusted Subscription Fees by notifying ASI of the same in writing prior to the Deemed Acceptance Date, then each of the parties shall thereafter have the right, but not the obligation, to elect to terminate the Agreement by notifying the other party in writing ("**Termination Notice**"). Adjusted Subscription Fees shall become effective upon the earlier of written acceptance from Customer of the same and the Deemed Acceptance Date. Any termination effected under this Section 12(b) will be effective ninety (90) days after receipt of the Termination Notice ("**Adjustment Rejection Termination Effective Date**"). For clarity, nothing herein shall prevent the parties from agreeing, at any time AFTER THE PROPOSED ADJUSTMENT NOTICE BUT BEFORE THE earlier of (x) the DEEMED ACCEPTANCE DATE, if any, and (y) the Adjustment Rejection Termination Effective Date to adjustments to the Subscription Fees that are different than those set forth in the Proposed Adjustment Notice, and such adjustments, if any, will become effective as may be agreed by the parties.

   (c)   Prices quoted do not include, and Customer shall pay, indemnify and hold ASI harmless from, all sales/use, gross receipts, value-added, GST, personal property or other taxes (including interest and penalties imposed thereon) arising from the transactions contemplated by this Agreement, except for taxes levied on ASI's income.

   (d)   Customer shall notify ASI of any change in the number of Users of a Subscription Service as soon as reasonably possible; provided that ASI may increase the number of Users used to compute subsequent Subscription Fees if it determines that more Users are using the Subscription Service than in the previous period.

   (e)   Customer shall be financially responsible for all sales or services taxes that are assessed on the fees and other amounts applicable to the Subscription Services provided to the Customer, excluding taxes based upon ASI's income ("**Sales Taxes**"). To the extent ASI is required to collect such Sales Taxes under applicable law, ASI, to the extent legally or otherwise required, shall separately state the amount of Sales Taxes due on its invoices to Customer. Customer and ASI shall cooperate to segregate the fees into (i) those for taxable Subscription Services and (ii) those for nontaxable Subscription Services. The parties shall reasonably cooperate with the

## MASTER SUBSCRIPTION SERVICE AGREEMENT

other to more accurately determine each party's tax liability and to minimize such liability, to the extent legally permissible. In addition, ASI shall provide and make available to Customer any information regarding the computation of any such Sales Taxes as reasonably requested by Customer. ASI shall not pay any Sales Taxes based on the Subscription Services that Customer and ASI disagree on as to whether a tax is due without affording Customer a reasonable amount of time after being called upon by the taxing authority to pay such Sales Taxes to dispute the payment of such Sales Taxes, at Customer's expense, in the appropriate legal forum.

13   **Audit.**

(a)   <u>On-Site Audit</u>. ASI may conduct audits of Customer's Use of the Subscription Service to ensure compliance with this Agreement (each, a "**Compliance Audit**"). Customer shall grant ASI, upon ASI's request, access to Customer's facilities during Customer's regular business hours for the purpose of conducting the Compliance Audit. ASI shall not unreasonably interfere with Customer's business activities while conducting the Compliance Audit. If an audit reveals that Customer has used the Subscription Service in breach of this Agreement, then ASI may, at its option: (i) charge Customer additional Subscription Fees that reflect Customer's actual use of the Subscription Service and shall also bear interest at the rate of one and three-quarters percent (1.75%) per month (or part thereof) or, if lower, the highest rate permitted by applicable law until paid related to such underpaid amounts; or (ii) immediately terminate this Agreement under Section 5. If ASI chooses to charge additional Subscription Fees, then Customer shall pay the additional Subscription Fees immediately upon receipt of ASI's invoice.

(b)   <u>Electronic Audit</u>. ASI may conduct an electronic audit of Customer's Use of the Subscription Service to ensure compliance with this Agreement (each, an "**Electronic Compliance Audit**"). Customer shall grant ASI, electronic access to ASI's installed software via remote access software (i.e., PC Anywhere, Microsoft Net Meeting, Remote Desktop, etc). If an Electronic Compliance Audit reveals that Customer has used the Subscription Service in breach of this Agreement, then ASI may, at its option: (i) charge Customer additional Subscription Fees that reflect Customer's actual use of the Subscription Service and shall also bear interest at the rate of one and three-quarters percent (1.75%) per month (or part thereof) or, if lower, the highest rate permitted by applicable law until paid related to such underpaid amounts; or (ii) immediately terminate this Agreement under Section 5. If ASI chooses to charge additional Subscription Fees, then Customer shall pay the additional Subscription Fees immediately upon receipt of ASI's invoice.

14   **Development/Distribution of Competing Products.**

Except for Customer's own internal, non-commercial use, Customer shall not develop or distribute computer programs that: (a) are functionally equivalent to the Subscription Service or any of its component parts; or (b) consists of a conversion or export of the Subscription Service (or the source code) to any database model, database manager, database/programming language, operating system, environment, hardware/software platform or client/server model of any kind now existing or hereafter developed.

15   **Disputes.**

The parties shall use reasonable efforts to resolve amicably any disputes that may relate to or arise under this Agreement. Any disputes that cannot be resolved in such manner shall be settled exclusively by arbitration conducted under the auspices of the American Arbitration Association (the "**AAA**"), in Philadelphia, Pennsylvania, in accordance with the Commercial

## Master Subscription Service Agreement

Arbitration Rules of the AAA; provided that either party may seek injunctive relief from any court of competent jurisdiction.  The award rendered in such arbitration shall be final, non-appealable and bind the parties, and any court having jurisdiction with respect thereto can enter judgment upon the award.  Without detracting from the generality of the foregoing, the following specific provisions shall also apply:

(a)   the proceedings shall be held before a panel of three arbitrators;

(b)   the arbitrators shall apply the law chosen in Section 16(i);

(c)   the prevailing party shall be entitled to recover, in addition to any other amounts awarded, an amount for legal and other related costs and expenses, including attorneys' fees, incurred thereby that is reasonable and equitable in relation to the award;

(d)   the costs of the arbitration (other than the parties' costs and expenses) will be allocated among the parties in the discretion of the arbitrators; and

(e)   the decision of the arbitrators shall be in writing stating the facts and law upon which the decision rests and shall be given no later than ten (10) days following the conclusion of the necessary hearings.

Customer shall have one (1) year from the accrual of any dispute or cause of action to commence arbitration in accordance with this Section 15.  If Customer fails to bring such arbitration within one (1) year of the accrual of the dispute or cause of action, then Customer shall be deemed to have waived whatever rights Customer may have had in relation to such dispute or cause of action including all legal and equitable remedies.

16   **Miscellaneous.**

(a)   Force Majeure.  Neither party shall have any liability for delay or non-fulfillment of any terms of this Agreement (other than non-payment) caused by any cause not within such party's direct control such as act of God, war, riots or civil disturbance, strikes, accident, fire, transportation conditions, labor and/or material shortages, governmental controls, regulations and permits and/or embargoes.

(b)   Notice.  All notices and other required communications hereunder shall be in writing and shall be given to the person either personally or by sending a copy thereof by first class mail, postage prepaid, or by recognized overnight courier service, charges prepaid, or by facsimile, to such party's address or facsimile number set forth below or such other address or facsimile number as may be modified by the receiving party by giving notice as provided in this Section 16(b).  If the notice is properly addressed and sent by mail as provided above, then the notice shall be deemed to have been given to and received by the person entitled thereto five (5) days after deposit in the United States mail.  If the notice is properly addressed and sent by courier service as provided above, then the notice shall be deemed to have been given to and received by the person entitled thereto one (1) business day after deposit with the courier service.  If the notice is sent by facsimile, then the notice shall be deemed to have been given to and received by the person entitled thereto when transmitted and confirmed by facsimile report.

## MASTER SUBSCRIPTION SERVICE AGREEMENT

| TO: ASI BUSINESS SOLUTIONS, INC. | TO: CUSTOMER |
|---|---|
| ASI Business Solutions, Inc. | Otsuka America Pharmaceutical Inc. |
| 2200 Renaissance Blvd. | 2440 Research Blvd. |
| King of Prussia, PA 19406 | Rockville, MD 20850 |
| | |
| Phone: (610) 265-9400 | Phone: (240) 683-3186 |
| Fax: (610) 265-4100 | Fax: (301) 721-7186 |
| | |
| Attn: Director Support Services | Attn: Sr. Contracts Manager |

(c)   <u>Severability</u>.  If any provision of this Agreement shall be determined to be void, invalid, unenforceable or illegal for any reason, then the validity and enforceability of all of the remaining provisions of this Agreement shall not be affected.  If any particular provision of this Agreement shall be adjudicated to be invalid or unenforceable, then such provision shall be deemed amended by limiting and reducing it so as to be valid and enforceable to the maximum extent compatible with the applicable laws of such jurisdiction, such amendment only to apply with respect to the operation of such provision in the applicable jurisdiction in which the adjudication is made.

(d)   <u>Waiver & Remedies</u>.  No waiver by either of the parties to this Agreement of any failure by the other party to keep or perform any covenant or condition of this Agreement shall be deemed a waiver of any preceding or succeeding breach of the same or any other covenant or condition.  Except as expressly provided to the contrary, the remedies provided in this Agreement shall be deemed cumulative, and the exercise of one shall not preclude the exercise of any other remedy nor shall the specifications of remedies in this Agreement exclude any rights or remedies at law or in equity, which may be available.

(e)   <u>Transferability</u>.  Customer shall not assign, transfer or encumber the rights granted under this Agreement without obtaining the prior written consent of ASI.  In the event of a transfer of ownership (e.g., sale, merger, consolidation, acquisition, etc.) ASI may elect, in its sole discretion, to transfer the rights granted under this Agreement to the Customer's legal successor(s) upon written request of Customer.  Notwithstanding, the Customer obligations in this Agreement shall apply to and be binding upon the Customer's legal successor(s).

(f)   <u>Independent Contractors</u>.  In making and performing this Agreement, the parties act and shall act at all times as independent contractors, and nothing contained herein shall be construed or implied to create an agency, association, partnership or joint venture between the parties.  At no time shall either party make commitments or incur any charges or expenses for or in the name of the other party.

(g)   <u>Titles</u>.  The titles of the Sections hereof are for convenience only and do not in any way limit or amplify the terms and conditions of this Agreement.

## MASTER SUBSCRIPTION SERVICE AGREEMENT

(h)  Publicity.  ASI may identify Customer as a client of ASI in ASI's marketing materials, which materials may be distributed by any method (including, without limitation, on ASI's web site).   In addition, with the prior approval of Customer (not to be unreasonably withheld or delayed), ASI may issue press releases regarding the nature of the business relationship established under this Agreement and/or testimonials from Customer as well as post such releases and testimonials on its web site.   Not withstanding, if written objection is not received from the Customer within ten (10) business days this will be deemed as expressed consent by the Customer to ASI.

(i)  Governing Law.   This Agreement shall be construed and interpreted and its performance shall be governed by the laws of the Commonwealth of Pennsylvania without regard to conflicts of law principles of any jurisdiction.

(j)  Amendments.  Except as provided in Section 2, this Agreement may not be modified or amended except by written form signed by authorized representatives of both parties.

(k)  Counterparts.   This Agreement, including each Subscription Service Index and all Appendices thereto, may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.

(l)  Effective Date.  This Agreement shall govern the relations of the parties as of the date first written above but shall not become effective until authorized representatives of both parties execute this Agreement and the Subscription Service Index.

(m)  Conflict.  In the event of a conflict, inconsistency or ambiguity among this Agreement and any Appendix hereto, the Appendix shall prevail.

(n)  Entire Agreement.  This Agreement, together with each Subscription Service Index and all Appendices thereto (all of which are incorporated by reference into this Agreement), contains the entire agreement between the parties hereto, and supersedes all other oral or written representations, statements, promises, agreements and letters or other expressions of intent of any kind with respect to the subject matter hereof between them.

**IN WITNESS WHEREOF**, ASI and Customer have caused this Agreement to be executed by their duly authorized representatives.

ASI BUSINESS SOLUTIONS, INC.

BY: _____

NAME:  JIM ALONSO

TITLE:  CHAIRMAN AND CEO

OTSUKA AMERICA PHARMACEUTICAL INC.

BY: _____

NAME:  Steven J. Weisel
        Vice President & General Counsel

TITLE: _____

11/19/2010

# Master Subscription Services Agreement

## Subscription Service Index 1

DB#1065024

**THIS SUBSCRIPTION SERVICE INDEX 1** is dated November 1, 2010, and incorporates by reference the following Subscription Service(s) into the Master Subscription Services Agreement between ASI Business Solutions, Inc., ("**ASI**"), and Otsuka America Pharmaceutical Inc., ("**Customer**"), dated November 1, 2010, as amended (the "**Agreement**").

Customer hereby subscribes to the following Subscription Service(s):

| APPENDIX | DATE |
|---|---|
| ☑ Appendix A 1-1, Software Upgrade and Support Addendum | November 1, 2010 |
| ☑ Appendix A 1-2, Apple iPad® Software Upgrade and Support Addendum | November 1, 2010 |
| ☑ Appendix B 1-1, Subscription Services Addendum<br>  ☑ Advanced Help Desk (First Year Only)<br>  ☑ Environment Hosting<br>  ☑ System Operations | November 1, 2010 |
| ☑ Appendix B 1-2, Apple iPad® Subscription Services Addendum<br>  ☑ Environment Hosting<br>  ☑ System Operations | November 1, 2010 |

**IN WITNESS WHEREOF**, for adequate consideration and intending to be legally bound, the parties hereto have caused this Subscription Service Index, to be executed by their duly authorized representatives on the date first above written.

ASI BUSINESS SOLUTIONS, INC.

BY: _____

NAME: JIM ALONSO

TITLE: CHAIRMAN AND CEO

DATE: NOVEMBER 1, 2010

OTSUKA AMERICA PHARMACEUTICAL INC.

BY: _____

NAME: Steven J. Weisel
Vice President & General Counsel

TITLE: _____

DATE: NOVEMBER 1, 2010



## Master Subscription Services Agreement
## Subscription Service Index 2

**THIS SUBSCRIPTION SERVICE INDEX 2** is dated February 10, 2012, and incorporates by reference the following Subscription Service(s) into the Master Subscription Services Agreement between ASI Business Solutions, Inc., (**"ASI"**), and Otsuka America Pharmaceutical Inc., (**"Customer"**), dated November 1, 2010, as amended (the **"Agreement"**).

Customer hereby subscribes to the following Subscription Service(s):

| APPENDIX | DATE |
|---|---|
| ☑ Appendix A 1-3, Software Upgrade and Support Addendum | February 10, 2012 |
| ☑ Appendix B 1-3, Subscription Services Addendum<br>    ☑ Environment Hosting<br>    ☑ System Operations | February 10, 2012 |

**IN WITNESS WHEREOF,** for adequate consideration and intending to be legally bound, the parties hereto have caused this Subscription Service Index, to be executed by their duly authorized representatives on the date first above written.

ASI BUSINESS SOLUTIONS, INC.                OTSUKA AMERICA PHARMACEUTICAL INC.

BY: _____            BY: _____

NAME: JIM ALONSO _____            NAME: _____

TITLE: CHAIRMAN AND CEO _____            TITLE: _____

DATE: FEBRUARY 10, 2012 _____            DATE: FEBRUARY 10, 2012 _____

# TASK ORDER FOR MASTER SERVICES AGMT

#

In accordance with the terms and conditions specified in the January 1, 2011 Master Services Agreement between Otsuka America Pharmaceutical, Inc. ("Otsuka"), and ASI BUSINESS SOLUTIONS, INC ("Consultant"), and by mutual agreement of Consultant and Otsuka this task number 6 is issued.

1. **STATEMENT OF WORK**

   Consultant shall provide services for Otsuka as described in the Statement of Work & Budget attached hereto as Schedule A.

2. **PERIOD OF PERFORMANCE**

   This task shall be performed from January 1, 2012 through December 31, 2017.

3. **TOTAL VALUE**

   The total value of this task shall not exceed $8,958,059.00 unless authorized in a writing signed by the parties and attached hereto.

**IN WITNESS WHEREOF** the parties have electronically signed this agreement using the Emptoris Enterprise Contract Management system as of the dates listed below.

Contract number: 7866

**Otsuka America Pharmaceutical, Inc.**

Digital signature code:


Name: Steven Weisel

Title:

Date: 3/12/2012

**ASI Business Solutions, Inc.**

Digital signature code:

MCwCFCQJn9j0iVEHtwJYSS+pqRZdm2PxAhQWJzHmIM7LLvtff1BJeUO+lH4rog==

Name: David Menzies

Title: Authorized Representative

Date: 3/9/2012

**Schedule A**

Contract # 7866

Page 1 of 2

**Task No.6 Statement of Work and Budget**

# EXHIBIT "B"

## Master Subscription Services Agreement
## Appendix A 1-3
## Software Upgrade and Support Addendum

**THIS SOFTWARE UPGRADE AND SUPPORT ADDENDUM A 1-3** is dated February 10, 2012, and sets forth certain terms and conditions by which ASI shall perform Software upgrades, support services and technical support with respect to the Subscription Services under the Master Subscription Services Agreement and the Subscription Service Index 2 by and between ASI and Otsuka America Pharmaceutical Inc., ("**Customer**"), dated November 1, 2010, (the "**Agreement**") and is subject to all of the terms and conditions of the Agreement.

1   **Definitions.**

Capitalized terms in this Appendix shall have the same meaning given to them in the Agreement to which this Appendix is attached.

2   **Additional Terms.**

Additional terms defined and contained in this Appendix (in alphabetical order) include the following:

(a)   "**ASI Apple iOS Applications IPA Build Procedure**" shall mean the ASI defined procedure for exchanging the Customer AppStore Credentials and IPA as currently documented in ASI Apple iOS Applications IPA Build Requirements and Procedures.

(b)   "**Change Request Form**" shall mean a standard form used to document and approve changes to the Scope of Work and/or Scope of Services provided by ASI.

(c)   "**Customer Application**" shall mean the integrated solution consisting of ASI Software products.

(d)   "**Customer AppStore**" shall mean the web server that contains all Apple iOS applications signed with the Customer AppStore Credentials.

(e)   "**Customer AppStore Credentials**" shall mean the Customer Enterprise Certificate, Provisioning Profile and the Private Key.

(f)   "**Customer Data**" shall mean the data supplied by the customer on a daily, weekly and/or monthly basis in electronic format.

(g)   "**Customer Specific IOS Edition**" shall mean the following ASI Leased Product, that when integrated together satisfy the Customer's requirements:

(i)   Business Intelligence (IPharmaToday™ - Version 2).

(h)   "**Customer Specific Premium Edition**" shall mean the following ASI Leased Product, that when integrated together satisfy the Customer's requirements:

(i)   Knowledge Management (ASI e-PharmaToday™ - Version 7).

(ii)   Business Intelligence (ASI Inquire® Premium Edition - Version 7).

(i)   "**Customer Specific Viewer Edition**" shall mean the following ASI Leased Product, that when integrated together satisfy the Customer's requirements:

(i)   Knowledge Management (ASI e-PharmaToday™ - Version 7).

(ii)   Business Intelligence (ASI Inquire® Viewer Edition - Version 7).

## Master Subscription Services Agreement
## Appendix A 1-3
## Software Upgrade and Support Addendum

(j)   "**Source Code Escrow Agreement**" shall mean an agreement between ASI, the Customer, and a third-party escrow agent, that stipulates the source code for the Leased Product(s) specified herein, and the specific events, terms and conditions under which such items may be released to the Customer.

**3    Points-of-Contact.**

(a)   <u>Customer.</u>    Jack Dempsey
                          Senior Project Manager
                          OAPI IT - Commercial Business Application Services
                          1 University Square Drive
                          Suite 500
                          Princeton, NJ  08540

                          Phone: (609) 524-6867
                          Fax:     (240) 514-3967

(b)   <u>ASI.</u>         Randy Bennett
                          Director, Support Services
                          ASI Business Solutions, Inc.
                          2200 Renaissance Blvd.
                          King of Prussia, PA 19406

                          Phone: (610) 265-9400
                          Fax:     (610) 265-4100

**4    Responsibilities.**

(a)   <u>Customer.</u>

    (i)     Customer shall assign a single point of contact (Project Manager) for all technical and operational communications and to manage change order control.   The Project Manager must be fully acquainted with Customer's information technology systems and processes.

    (ii)    Customer shall provide laptop/tablet computer(s) (one for each Sales Force) that can be used by ASI for the purposes of image unit and system testing, problem diagnosis and resolution.

    (iii)   Customer shall provide an Apple iOS® device (one for each Sales Force/device combination) that can be used by ASI for the purposes of image unit and system testing, problem diagnosis and resolution.

    (iv)    Customer shall acquire and supply their Customer AppStore Credentials to ASI for the purpose of building a version of the Customer Specific Apple iPad® Edition that can be posted onto the Customer AppStore.  Further, the customer agrees to follow the ASI Apple iOS Applications IPA Build Procedure to manage access to the preceding credentials.

    (v)     Customer is responsible for providing ASI with updated credentials at least one (1) month prior to annual expiration of the Customer AppStore Credentials.

    (vi)    Customer may be responsible for implementing any error corrections supplied by ASI.

## Master Subscription Services Agreement
## Appendix A 1-3
## Software Upgrade and Support Addendum

    (vii)   Customer may be responsible for integration and installation of all Releases supplied by ASI.

    (viii)   Customer is exclusively responsible for the supervision, management, backup, security and control of all aspects of Customer's information technology systems.

(b)   ASI.

    (i)   ASI shall assign a single point of contact (Program Manager) for all technical and operational communications and to manage change order control to/from Customer.

    (ii)   ASI shall staff the project with personnel having the necessary skills and experience to complete the services in accordance with the Scope of Services stated herein.

    (iii)   ASI Program Manager shall communicate problem areas immediately to the Customer Program Manager and define joint actions required to ensure successful service delivery.

    (iv)   ASI shall provide the Subscription Services out of their US based facilities.

    (v)   ASI shall provide and review the ASI Apple IOS Applications IPA Build Procedure with the Customer.

    (vi)   ASI agrees to only use the Customer AppStore Credentials for the purpose of building an IPA that can be posted onto the Customer AppStore. ASI agrees to adhere to the procedures defined in the ASI Apple iOS Applications IPA Build Procedure to safeguard the Customer AppStore Credentials.

**5**   **Scope of Services.**

ASI will provide a sufficient number of qualified staff to successfully perform the support and technical services listed in this Section 5 and in **Table 1 – Subscription Services Coverage Hours,** during the Coverage Hours, specified therein:

### Table 1 – Subscription Services Coverage Hours

| Subscription Service | Coverage Hours * |
|---|---|
| Support Services Management | 9:00 AM - 5:00 PM, ET, M-F |
| Technical Support | 9:00 AM - 5:00 PM, ET, M-F |

    * National holidays of the United States are excluded from Coverage Hours.

Each of the above Subscription Services is described in greater detail below.

(a)   Support Services Management:

    (i)   Act as a single point of contact for the Customer.

    (ii)   Coordinate and focus ASI's internal resources for the acquired Subscription Services as necessary to efficiently and effectively support the Customer's needs.

    (iii)   Ensure all calls are escalated until a resolution and/or workaround has been

## Master Subscription Services Agreement
## Appendix A 1-3
## Software Upgrade and Support Addendum

identified and implemented.

(iv)   Participate in technical discussions as required by the Customer.

(v)   Proactively advise the Customer of ways to improve services and how to fully leverage ASI's products and services.

(vi)   Proactively present to the Customer new technologies, services or pharmaceutical industry information that may be relevant to the Customer's business.

(vii)   Conduct face-to-face account status review meetings with the Customer on a monthly and/or quarterly basis.

(b)   <u>Technical Support</u>:

(i)   Researching data anomalies within the Customer Data, as well as Customer Application data.

(ii)   Issues within the Customer Application that are not identified as system bugs.

(iii)   Participating in technical discussions as required by the Customer.

(c)   <u>Software License; Version Updates and Major Releases</u>:

(i)   ASI grants to the Customer a non-exclusive, right-to-use license for up to the number of users specified in Section 6 of this Appendix A 1-3 to install, start, load, execute and display (i) the Software which is specified in Section 6 of in this Appendix A 1-3 and (ii) all version updates and major releases of such Software (collectively, the "Releases") if and when ASI makes such Releases generally and commercially available.   The non-exclusive, right-to-use license for the Subscription Services specified above expires upon the expiration or earlier termination of the Appendix A 1-3 Term in accordance with this Appendix A 1-3 and the Agreement.

(ii)   ASI shall allocate a support engineer to any error in the Software reported to ASI. The support engineer will then be responsible for arranging for diagnosis and resolution of the error, and ASI shall use commercially reasonable efforts to resolve the errors within a reasonable period of time.

6   **Software Applicability.**

| Product | Version | Location | Number of Users |
|---|---|---|---|
| Customer Specific Premium Edition | N/A | Not Applicable | Up to 3 |
| Customer Specific Viewer Edition | N/A | Not Applicable | Up to 1,497 |
| Customer Specific iOS Edition | N/A | Not Applicable | Up to 1,500 |
| ASI Console® | N/A | 2200 Renaissance Blvd. King of Prussia, PA 19406 | Up to 1,500 |

## Master Subscription Services Agreement
## Appendix A 1-3
## Software Upgrade and Support Addendum

As part of this Agreement, and only for the duration of the term of this Software and Upgrade Support Addendum, ASI has also included an equivalent number of Sales Force Automation non-exclusive, right-to-use licenses at no additional charge to Customer. ASI will charge Customer a fee for Subscription Services related to the support of the Sales Force Automation Software if the Sales Force Automation Software is enabled. Any implementation services required by the Customer in support of the activation of the Sales Force Automation software shall be described in and carried out under a separate Statement of Work (SOW) between the parties under the existing Master Professional Services Agreement.

7   **Source Code Escrow Agreement.**

Both ASI and the Customer agree as follows:

(a)   ASI will begin a process to enter into a written Source Code Escrow Agreement, with a source code escrow agent reasonably acceptable to Customer that names Customer as a beneficiary with regards to the Leased Product, within forty-five (45) days of the effective date of this Appendix A 1-3 to the Agreement and complete the contract within ninety (90) days thereafter.

(b)   Customer will bear all costs to initially establish this Source Code Escrow Agreement, as well as all ongoing support costs associated with the administration thereof.

(c)   The Source Code Escrow Agreement shall include, at a minimum, commercially reasonable clauses addressing the following points:

   (i)   Identification of escrow agent, chosen by the Customer that will serve as administrator.

   (ii)   Source code definition.

   (iii)   Engagement of escrow agent.

   (iv)   Requirements for deposit of source code, which shall at a minimum require deposit of source code and all libraries, tools, utilities and other related materials (excluding 3rd party products which will be identified by ASI) that are necessary to compile the Leased Product and which shall be deposited on a reasonable schedule driven by updates to the Leased Products.

   (v)   Source code ownership.

   (vi)   Source code verification.

   (vii)   Representations of ASI to Customer.

   (viii)   Definition of "release events," shall mean release if ASI (a) becomes insolvent; (b) admits in writing its insolvency or inability to pay its debts or perform its obligations in the ordinary course of business as they mature; or (c) becomes the subject of any voluntary or involuntary proceeding in bankruptcy, liquidation, dissolution, receivership, attachment or composition, or makes a general assignment for the benefit of creditors, that is not dismissed with prejudice within ninety (90) days after the institution thereof.

   (ix)   Procedures for release of source code.

## Master Subscription Services Agreement
## Appendix A 1-3
## Software Upgrade and Support Addendum

(x)   Use of source code by Customer.  ASI hereby grants Customer right to use the source to support and maintain the Leased Product and otherwise use the Leased Product in accordance with Section 3 of the Agreement, provided that Customer agrees that it shall not exercise any of the foregoing rights until and unless a release event occurs.

(xi)   Termination.

(xii)   Disputes.

(xiii)   Obligations and liabilities of escrow agent.

(xiv)   Payment to escrow agent.

(xv)   Confidentiality.

(xvi)   Waiver and severability.

(xvii)   Notices.

(xviii)  Successors and assigns.

(xix)   Governing law.

**8**   **Term, Subscription Fees, Payment Schedule and Assumptions.**

(a)   Term:

    (i)   This Appendix A 1-3 shall commence on January 1, 2012 and shall continue and remain in effect until expiration, termination or non-renewal of Appendix B 1-3, Subscription Services Addendum in accordance with the Agreement.

    (ii)   Execution of this Appendix A 1-3 will result in the automatic cancelation of Master Subscription Services Agreement, Appendix A 1-1 and Appendix A 1-2.

    (iii)   Upon expiration or termination of this Appendix A 1-3, Customer shall cease using and accessing the Subscription Services defined herein.

(b)   Subscription Fees and Payment Schedule:

    (i)   All Customer fees associated with this right-to-use license (along with the associated Support Services fees) are covered in Subscription Service Index-2, Appendix B 1-3, Subscription Services Addendum.

(c)   Assumptions:

    (i)   Changes to the Scope of Services listed in this Appendix A 1-3 will result in a need for ASI to allocate additional resources.  In such event, ASI shall submit a written request to Customer reflecting the actual increase in expenses resulting from the changed circumstances.

    (ii)   All project scope changes will be submitted in written form using the standard ASI Change Request Form.  If changes occur after the initial estimates are established, then the resulting difference, if any, will be invoiced in accordance with the approved ASI Change Request Form.

Master Subscription Services Agreement
Appendix A 1-3
Software Upgrade and Support Addendum

(iii)   Subscription Fees quoted and referenced are in US Dollars.

(iv)   Subscription Fees quoted do not include sales tax or any other government related fees and are the responsibility of the Customer and will not be paid or collected by ASI.

(v)   Subscription Fees quoted do not include cost for ASI travel and related project expense(s), as necessary.

(vi)   All Customer approved travel and related project expense(s) will be billed at cost.

(vii)   All pre-approved related travel expense(s) will be billed as they are incurred.

(viii)   All pre-approved related project expense(s) will be billed on the 1st of the month and payable upon receipt.

**9   Coordination with Agreement.**

Releases shall be considered part of the Software for all purposes of the Agreement except that the Warranty Period specified in Section 5(a) of the Agreement with respect to such Release shall begin on the date that such Release is first deployed by the Customer for Customer's internal use and shall end in the date which is ninety (90) days thereafter.

**10   Access Apps.**

ASI will provide the applicable services under this Appendix A 1-3 with respect to Access Apps; provided however, that in the event that an Access App is determined by ASI to require a patch, fix or other update in order to address an issue with respect to its functionality or availability, such patch, fix or other update is subject to the approval and availability policies of the applicable third party provider of the same through which such patch, fix or other update must be offered to its users. Accordingly, ASI shall not be responsible or liable in any manner whatsoever under this Appendix A 1-3 or otherwise for any delay or failure to make available any such patch, fix or other update by such third party provider.

**11.   Term.**

This Agreement shall begin on January 1, 2012 and extend through January 31, 2017 unless modified in writing between both parties.

**12.   Budget.**

The total contract value of this Task Order shall not exceed EIGHT MILLION NINE HUNDRED FIFTY EIGHT THOUSAND FIFTY NINE DOLLARS ($8,958,059) unless modified in writing by both parties.

## Master Subscription Services Agreement
## Appendix A 1-3
## Software Upgrade and Support Addendum

IN WITNESS WHEREOF, the parties hereto have set their hands and seals the day and year first above written.

**For: Otsuka America Pharmaceutical, Inc.**          **For:  ASI Business Solutions, Inc.**

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

# TASK ORDER FOR MASTER SERVICES AGMT

#

In accordance with the terms and conditions specified in the January 1, 2011 Master Services Agreement between Otsuka America Pharmaceutical, Inc. ("Otsuka"), and ASI BUSINESS SOLUTIONS, INC ("Consultant"), and by mutual agreement of Consultant and Otsuka this task number 6 is issued.

### 1. STATEMENT OF WORK

Consultant shall provide services for Otsuka as described in the Statement of Work & Budget attached hereto as Schedule A.

### 2. PERIOD OF PERFORMANCE

This task shall be performed from January 1, 2012 through December 31, 2017.

### 3. TOTAL VALUE

The total value of this task shall not exceed $8,958,059.00 unless authorized in a writing signed by the parties and attached hereto.

**IN WITNESS WHEREOF** the parties have electronically signed this agreement using the Emptoris Enterprise Contract Management system as of the dates listed below.

Contract number: 7866

**Otsuka America Pharmaceutical, Inc.**

Digital signature code:


Name: Steven Weisel

Title:

Date: 3/12/2012

**ASI Business Solutions, Inc.**

Digital signature code:

MCwCFCQJn9j0iVEHtwJYSS+pqRZdm2PxAhQWJzHmIM7LLvtff1BJeUO+lH4rog==

Name: David Menzies

Title: Authorized Representative

Date: 3/9/2012

**Schedule A**

Contract # 7866                                                     Page 1 of 2

Task No.6 Statement of Work and Budget

EXHIBIT "C"

# Master Subscription Services Agreement
## Appendix B 1-3
## Subscription Services Addendum

**THIS SUBSCRIPTION SERVICES APPENDIX B 1-3** is dated February 10, 2012, and sets forth certain terms and conditions by which ASI shall perform Subscription Services under the Master Subscription Services Agreement and the Subscription Service Index 2 by and between ASI and Otsuka America Pharmaceutical Inc., ("**Customer**"), dated November 1, 2010, (the "**Agreement**") and is subject to all of the terms and conditions of the Agreement.

1   **Definitions.**

Capitalized terms in this Appendix shall have the same meaning given to them in the Agreement to which this Appendix is attached.

2   **Additional Terms.**

Additional terms defined and contained in this Appendix B 1-3 (in alphabetical order) include the following:

(a)   "**Advanced Help Desk**" shall mean a call relating to the Customer Application that is complex in nature, requests assistance with the template library and/or distributing complicated analysis to other users.

(b)   "**Change Request Form**" shall mean a standard form used to document and approve changes to the Scope of Work and/or Scope of Services provided by ASI.

(c)   "**Critical Hosting Outages**" shall mean periods of time where the Customer Host Environment will be offline to enable ASI Hosting Service Technicians to perform ad-hoc hardware and software maintenance, such as applying critical operating system security patches recommended by the manufacturer or related to 3rd party service providers (e.g., utility companies, telephone company, etc.).

(d)   "**Customer Application**" shall mean the integrated solution consisting of the ASI information technology service or solution and Software comprising a part of the Subscription Services subscribed for by the Customer under the Agreement.

(e)   "**Customer Data**" shall mean the data supplied by the customer on a daily, weekly and/or monthly basis in electronic format.

(f)   "**Customer Host Environment**" shall mean the following hardware and software components (sized to support up to 1,500 Users) on which the Customer Application is installed and operated:

(i)   Data Analysis Production Server

(ii)   Data Analysis Test Server (Mirrors Production)

(iii)   Data Communications Server

(iv)   System Administration Production Server

(v)   System Administration Test Server

(vi)   Firewall

(vii)   Telecommunications Circuit

(viii)   Router (Cisco)

(ix)   Apple iOS Data, Communications and Authentication Server(s)

# Master Subscription Services Agreement
## Appendix B 1-3
## Subscription Services Addendum

(g)   **"Customer Specific iOS Edition"** shall mean the following ASI Leased Product, that when integrated together, satisfy the Customer's requirements:

    (i)   Business Intelligence (iPharmaToday™ - Version 2).

(h)   **"Customer Specific Premium Edition"** shall mean the following ASI Leased Product, that when integrated together, satisfy the Customer's requirements:

    (i)   Knowledge Management (ASI e-PharmaToday™ - Version 7).

    (ii)   Business Intelligence (ASI Inquire® Premium Edition - Version 7).

(i)   **"Customer Specific Viewer Edition"** shall mean the following ASI Leased Product, that when integrated together, satisfy the Customer's requirements:

    (i)   Knowledge Management (ASI e-PharmaToday™ - Version 7).

    (ii)   Business Intelligence (ASI Inquire® Viewer Edition - Version 7).

(j)   **"Help Desk Analyst"** shall mean an individual within ASI that is responsible for answering Basic Help Desk Calls.

(k)   **"Hosting Service"** shall mean the ASI provided facilities, capabilities and services, that when combined, house and support the Customer Host Environment.

(l)   **"Hosting Service Technician"** shall mean an individual within ASI that is responsible for performing Hosting Service functions for ASI Customers.

(m)   **"Level 1"** shall mean the type of question that can be addressed by either a Help Desk Analyst or a Product Specialist.

(n)   **"Level 2"** shall mean the type of question that can be addressed by a System Administrator.

(o)   **"Level 3"** shall mean the type of question that can be addressed by a Technical Support Analyst.

(p)   **"Level 4"** shall mean the type of question that can be addressed by a Software Developer.

(q)   **"Product Specialist"** shall mean an individual within ASI that is also responsible for answering complex Advanced Help Desk calls.

(r)   **"Scheduled Hosting Outages"** shall mean pre-arranged periods of time where the Customer Host Environment will be offline to enable ASI Hosting Service Technicians to perform routine hardware and software preventive maintenance as well as activities associated with backing up and protecting the Customer Host Environment and Customer Data.

(s)   **"Severity 1"** shall mean a major problem that prevents one or many Users from using the Customer Application.  The target response time for this type of problem is two (2) consecutive business hours.

## Master Subscription Services Agreement
## Appendix B 1-3
## Subscription Services Addendum

(t)  "**Severity 2**" shall mean a moderate problem that hinders one or many Users from using the Customer Application.  In this instance, the individual can continue to work or may be given a way in which they can continue to work until such time that a more permanent solution can be found.  The target response time for this type of problem is eight (8) consecutive business hours.

(u)  "**Severity 3**" shall mean a minor problem that is considered to be a nuisance and does not seriously impact using the Customer Application.  The target response time for this type of problem is (16) consecutive business hours.

(v)  "**Severity Level**" shall mean either Severity Levels 1, 2 or 3.

(w)  "**Software Developer**" shall mean an individual within ASI that is responsible for modifying and enhancing the Customer Application.

(x)  "**Systems Administrator**" shall mean an individual within ASI that is responsible for managing the operational environment for the Customer Application.

(y)  "**Technical Support Analyst**" shall mean an individual within ASI that is responsible for providing advanced Customer Application support.

3  **Points-of-Contact.**

(a)  <u>Customer</u>.  Jack Dempsey
Senior Project Manager
OAPI IT - Commercial Business Application Services
1 University Square Drive
Suite 500
Princeton, NJ  08540

Phone: (609) 524-6867
Fax:     (240) 514-3967

(b)  ASI.  Randy Bennett
Director, Support Services
ASI Business Solutions, Inc.
2200 Renaissance Blvd.
King of Prussia, PA 19406

Phone: (610) 265-9400
Fax      (610) 265-4100

4  **Responsibilities.**

(a)  <u>Customer</u>.

(i)  Customer shall assign a single point of contact (Project Manager) for all technical and operational communications and to manage change order control.  The Project Manager must be fully acquainted with Customer's information technology systems and processes.

(ii)  Customer shall provide laptop/tablet computer(s) (one for each Sales Force) that can be used by ASI for the purposes of image unit and system testing, problem diagnosis and resolution.

Master Subscription Services Agreement
Appendix B 1-3
Subscription Services Addendum

    (iii)  Customer shall provide an Apple iOS® device (one for each Sales Force/device combination) that can be used by ASI for the purposes of image unit and system testing, problem diagnosis and resolution.

(b)  ASI.

    (i)  ASI shall assign a single point of contact (Program Manager) for all technical and operational communications and to manage change order control to/from Customer.

    (ii)  ASI shall staff the project with personnel having the necessary skills and experience to complete the services in accordance with the Scope of Services stated herein.

    (iii)  ASI Program Manager shall communicate problem areas immediately to the Customer Program Manager and define joint actions required to ensure successful service delivery.

    (iv)  ASI shall provide these services out of their US based facilities.

**5   Scope of Services.**

If Customer has paid all related Subscription Fees, ASI will provide a sufficient number of qualified staff to successfully perform the services listed in **Table 1 – Subscription Services Coverage Hours,** during the Coverage Hours specified therein:

**Table 1 – Subscription Services Coverage Hours**

| Subscription Service | Coverage Hours * |
|---|---|
| Environment Hosting | 24 Hours/Day, 365 Days/Year |
| System Operations | 9:00 AM - 5:00 PM, ET, M-F |

    * National holidays of the United States are excluded from Coverage Hours.

Each of the above Subscription Services and their method of access are described in greater detail below.

(a)  Access; Process:  The method for accessing any of the above Subscription Services is defined below:

    (i)  Customer will place calls to the ASI telephone support line assigned to the Customer so that the issue can be classified, routed and tracked. In the event the line is busy or that the call is received outside of the Coverage Hours, then the call will be forwarded to an ASI Help Desk voice mailbox assigned to the Customer.

    (ii)  All such calls are initially classified Level 1 and routed to a Help Desk Analyst or Product Specialist depending on the nature and difficulty of the problem.

    (iii)  The Help Desk Analyst or Product Specialist will use their reasonable efforts to address and resolve the issue in accordance with the Severity Level assigned to the problem by ASI in its sole discretion.

Master Subscription Services Agreement
Appendix B 1-3
Subscription Services Addendum

    (iv)   If the Help Desk Analyst or Product Specialist cannot resolve the issue, it will be routed to the appropriate resource (Hosting Service Technician, Product Specialist, Systems Administrator or Technical Support Analyst) based on the Severity Level of the issue as well as the type of service the Customer has purchased.

    (v)   If the Customer does not have the requisite ASI services needed to address the issue, then the Customer can either nominate an internal point of contact or request that ASI perform the function on a first come first serve basis at ASI's then current Professional Service rates pursuant to a Professional Services Agreement between the parties.

    (vi)   All calls will continue to be escalated until a resolution and/or workaround has been identified and implemented.

    (vii)   The Customer will be notified in advance if it is necessary to implement a workaround solution.

    (viii)   All calls will be logged and tracked using an ASI internal system.

(b)   <u>Hosting Service</u>:

    (i)   Controls physical security (carded/biometric access) to the Customer Host Environment.

    (ii)   Monitors environmental facilities (e.g., space, air-conditioning, heating, lighting, cabling, uninterruptible power supply, etc.) to properly house and permit the Customer Host Environment to operate within normal specifications and tolerances.

    (iii)   Electronic monitoring of site availability (hardware, software and communications).

    (iv)   Log and track all outages using an ASI internal system.

    (v)   Perform daily, weekly and monthly backups.

    (vi)   Execute disaster recovery procedures (hardware, software or data) in the event they are needed.

    (vii)   Install, test and put into production, applicable operating system patches to ensure that all servers remain current with critical security updates and service packs recommended by the manufacturer.

    (viii)   Error resolution and notification.

(c)   <u>System Operations</u>:

    (i)   Manage the test and production Customer Application environments (comprised of various applications and data servers).

    (ii)   Customer user security and administration, user group administration and data security.

Master Subscription Services Agreement
Appendix B 1-3
Subscription Services Addendum

(iii) Accept and process changes to existing data source volumes e.g., product/market changes to sales data (e.g., Rx and $'s), alignment changes, new detail products, new sample products, new targets/ratings.

(iv) Integrate unlimited report template changes that have been made by Customer personnel.

(v) On a weekly basis load Customer data, perform data quality control, move Customer data to production and data slicing processes.

(vi) Monitoring disk(s) space, performance and availability of the Customer Application platforms and environment.

(vii) System installation and integration support (client and server).

(viii) Error resolution and notification.

(ix) Coordinate system updates of the Customer solution with the end user community.

6    **Term, Subscription Fees, Payment Schedule and Assumptions.**

(a) Term:

(i) This Appendix B 1-3 shall commence on January 1, 2012, and shall end on December 31, 2017 (the "Initial Term").

(ii) Execution of this Appendix B 1-3 will result in the automatic cancelation of Master Subscription Services Agreement, Appendix B 1-1 and Appendix B 1-2.

(iii) Upon expiration or termination of this Appendix B 1-3, Customer shall cease using and accessing the Subscription Service and promptly return the same to ASI.

(b) Early Termination Option:

(i) ASI agrees to provide the Customer with an early termination option for the purposes of dealing with business uncertainties in 2016 through 2017. Notwithstanding anything contained to the contrary in the Master Agreement, this option is subject to the following conditions and terms and any such early termination will not become effective unless the same are satisfied in full:

1. The option cannot be exercised before January 1, 2016.

2. A six (6) month advanced notification is required prior to the effective termination date (e.g., to terminate effective January 1, 2016, written notice must be received by ASI no later than July 1, 2015).

3. An accelerated early termination fee will be due and payable from the point of termination through December 31, 2017 (in lieu of the fees that would have been due and payable had this Appendix not been terminated prior to the end of the Initial Term). The entire early termination fee will be due upon invoice receipt and calculated using the following formula:

# Master Subscription Services Agreement
## Appendix B 1-3
### Subscription Services Addendum

**Early Termination Fee** = (40% of the fees due on the undelivered portion of the 2016 services – as if the Appendix were not terminated early) + (50% of the fees due on the undelivered portion of the 2017 services that would have been delivered - assuming for this purpose full performance thereof - had the Appendix not been terminated early).

By way of example, if notice is given on February 1st, 2016 then the effective termination date would be August 1st 2016 and the fees due would be 40% of the remaining five (5) months of possible service for 2016 plus 50% of the entire fee due for all of 2017.

(ii)   Except as otherwise expressly provided in this Section, all of the terms and conditions contained in the Master Agreement in respect to termination of this Appendix shall be and remain in full force and effect.

(c)   <u>Subscription Fees and Payment Schedule</u>:

(i)   ASI's Subscription Fees and Payment Schedule are as follows:

### Subscription Fees & Payment Schedule

| Subscription Fee Description | Payment Due Date | Payment Amount |
|---|---|---|
| Initial 3 Customer Specific Premium & 462 Viewer Edition Users | Jan 1, 2012 | $550,000 |
| Initial 465 Customer Specific iOS Edition (pro-rated 10 months) Users | Mar 1, 2012 | $193,750 |
| Customer Host Environment Upgrade | Mar 1, 2012 | $20,000 |
| Additional 535 Customer Specific Viewer & iOS Edition (pro-rated for 7 months) | Jun 1, 2012 | $421,234 |
| Initial 3 Customer Specific Premium & 462 Viewer Edition and 465 iOS Edition Users | Jan 1, 2013 | $832,500 |
| Additional 535 Customer Specific Viewer & iOS Edition Users | Jan 1, 2013 | $722,115 |
| Initial 3 Customer Specific Premium & 462 Viewer Edition and 465 iOS Edition Users | Jan 1, 2014 | $832,500 |
| Additional 535 Customer Specific Viewer & iOS Edition Users | Jan 1, 2014 | $722,115 |
| Initial 3 Customer Specific Premium & 462 Viewer Edition and 465 iOS Edition Users | Jan 1, 2015 | $832,500 |
| Additional 535 Customer Specific Viewer & iOS Edition Users | Jan 1, 2015 | $722,115 |
| Initial 3 Customer Specific Premium & 462 Viewer Edition and 465 iOS Edition Users | Jan 1, 2016 | $832,500 |
| Additional 535 Customer Specific Viewer & iOS Edition Users | Jan 1, 2016 | $722,115 |
| Initial 3 Customer Specific Premium & 462 Viewer Edition and 465 iOS Edition Users | Jan 1, 2017 | $832,500 |
| Additional 535 Customer Specific Viewer & iOS Edition Users | Jan 1, 2017 | $722,115 |

Master Subscription Services Agreement
Appendix B 1-3
Subscription Services Addendum

    (ii)    The cost per user for the Customer Specific Premium, Viewer and iOS Editions for 1,001 up to 1,500 users is $1,415.35

    (iii)    Invoices for Subscription Fees will be submitted on an annual basis, in advance of the commencement of such calendar year.

(d)    <u>Assumptions</u>:

    (i)    Changes to the Scope of Services listed in this Appendix B 1-3 will result in a need for ASI to allocate additional resources. In such event, ASI shall submit a written request to Customer reflecting the actual increase in expenses resulting from the changed circumstances.

    (ii)    All project scope changes will be submitted in written form using the standard ASI Change Request Form. If changes occur after the initial estimates are established, then the resulting difference, if any, will be invoiced in accordance with the approved ASI Change Request Form.

    (iii)    Subscription Fees quoted and referenced are in US Dollars.

    (iv)    Subscription Fees quoted do not include sales tax or any other government related fees and are the responsibility of the Customer and will not be paid or collected by ASI.

    (v)    Subscription Fees quoted do not include cost for ASI travel and related project expense(s), as necessary.

    (vi)    All Customer approved travel and related project expense(s) will be billed at cost.

    (vii)    All pre-approved related travel expense(s) will be billed as they are incurred.

    (viii)    All pre-approved related project expense(s) will be billed on the 1st of the month and payable upon receipt.

**7**    <u>**Access Apps.**</u>

ASI will provide the applicable services under this Appendix B 1-3 with respect to Access Apps; <u>provided however</u>, that in the event that an Access App is determined by ASI to require a patch, fix or other update in order to address an issue with respect to its functionality or availability, such patch, fix or other update is subject to the approval and availability policies of the applicable third party provider of the same through which such patch, fix or other update must be offered to its users. Accordingly, ASI shall not be responsible or liable in any manner whatsoever under this Appendix B 1-3 or otherwise for any delay or failure to make available any such patch, fix or other update by such third party provider.

**8**    <u>**Term.**</u>

This Agreement shall begin on January 1, 2012 and extend through January 31, 2017 unless modified in writing between both parties.

# Master Subscription Services Agreement
## Appendix B 1-3
## Subscription Services Addendum

9    **Budget.**

The total contract value of this Task Order shall not exceed EIGHT MILLION NINE HUNDRED FIFTY EIGHT THOUSAND FIFTY NINE DOLLARS ($8,958,059) unless modified in writing by both parties.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals the day and year first above written.

**For: Otsuka America Pharmaceutical, Inc.**        **For:  ASI Business Solutions, Inc.**


Name: _____        Name: _____

Title: _____        Title: _____


Date: _____        Date: _____

# TASK ORDER FOR MASTER SERVICES AGMT

\#

In accordance with the terms and conditions specified in the January 1, 2011 Master Services Agreement between Otsuka America Pharmaceutical, Inc. ("Otsuka"), and ASI BUSINESS SOLUTIONS, INC ("Consultant"), and by mutual agreement of Consultant and Otsuka this task number 6 is issued.

### 1. STATEMENT OF WORK

Consultant shall provide services for Otsuka as described in the Statement of Work & Budget attached hereto as Schedule A.

### 2. PERIOD OF PERFORMANCE

This task shall be performed from January 1, 2012 through December 31, 2017.

### 3. TOTAL VALUE

The total value of this task shall not exceed $8,958,059.00 unless authorized in a writing signed by the parties and attached hereto.

**IN WITNESS WHEREOF** the parties have electronically signed this agreement using the Emptoris Enterprise Contract Management system as of the dates listed below.

Contract number: 7866

**Otsuka America Pharmaceutical, Inc.**

Digital signature code:


Name: Steven Weisel

Title:

Date: 3/12/2012

**ASI Business Solutions, Inc.**

Digital signature code:

MCwCFCQJn9j0iVEHtwJYSS+pqRZdm2PxAhQWJzHmlM7LLvtff1BJeUO+lH4rog==

Name: David Menzies

Title: Authorized Representative

Date: 3/9/2012

**Schedule A**

Contract # 7866                                                    Page 1 of 2

Task No.6 Statement of Work and Budget

# EXHIBIT "D"

Master Subscription Services Agreement
Appendix B 1-4
Subscription Services Addendum

**THIS SUBSCRIPTION SERVICES APPENDIX ("APPENDIX") B 1-4** is dated January 1, 2013, and sets forth certain terms and conditions by which ASI shall perform Subscription Services under the Master Subscription Services Agreement and the Subscription Service Index 3 by and between ASI and Otsuka America Pharmaceutical Inc., ("**OAPI or Customer**"), dated November 1, 2010, (the "**Agreement**") and is subject to all of the terms and conditions of the Agreement.

**1    Definitions.**

Capitalized terms in this Appendix shall have the same meaning given to them in the Agreement to which this Appendix is attached.

**2    Additional Terms.**

Additional terms defined and contained in this Appendix B 1-4 (in alphabetical order) include the following:

(a)    "**Advanced Help Desk**" shall mean a call relating to the Customer Application that is complex in nature, requests assistance with the template library and/or distributing complicated analysis to other users.

(b)    "**Change Request Form**" shall mean a standard form used to document and approve changes to the Scope of Work and/or Scope of Services provided by ASI.

(c)    "**Critical Hosting Outages**" shall mean periods of time where the Customer Host Environment will be offline to enable ASI Hosting Service Technicians to perform ad-hoc hardware and software maintenance, such as applying critical operating system security patches recommended by the manufacturer or related to 3rd party service providers (e.g., utility companies, telephone company, etc.).

(d)    "**Customer Application**" shall mean the integrated solution consisting of the ASI information technology service or solution and Software comprising a part of the Subscription Services subscribed for by the Customer under the Agreement.

(e)    "**Customer Data**" shall mean the data supplied by the customer on a daily, weekly and/or monthly basis in electronic format.

(f)    "**Customer Host Environment**" shall mean the following hardware and software components (sized to support up to 1,500 Users) on which the Customer Application is installed and operated:

(i)     Data Analysis Production Server

(ii)    Data Analysis Test Server (Mirrors Production)

(iii)   Data Communications Server

(iv)    System Administration Production Server

(v)     System Administration Test Server

(vi)    Firewall

(vii)   Telecommunications Circuit

(viii)  Router (Cisco)

(ix)    Apple iOS Data, Communications and Authentication Server(s)

## Master Subscription Services Agreement
## Appendix B 1-4
## Subscription Services Addendum

(g)     **"Customer Specific iOS Edition"** shall mean the following ASI Leased Product, that when integrated together, satisfy the Customer's requirements:

   (i)     Business Intelligence (iPharmaToday™ - Version 2).

(h)     **"Customer Specific Premium Edition"** shall mean the following ASI Leased Product, that when integrated together, satisfy the Customer's requirements:

   (i)     Knowledge Management (ASI e-PharmaToday™ - Version 7).

   (ii)     Business Intelligence (ASI Inquire® Premium Edition - Version 7).

(i)     **"Customer Specific Viewer Edition"** shall mean the following ASI Leased Product, that when integrated together, satisfy the Customer's requirements:

   (i)     Knowledge Management (ASI e-PharmaToday™ - Version 7).

   (ii)     Business Intelligence (ASI Inquire® Viewer Edition - Version 7).

(j)     **"Help Desk Analyst"** shall mean an individual within ASI that is responsible for answering Basic Help Desk Calls.

(k)     **"Hosting Service"** shall mean the ASI provided facilities, capabilities and services, that when combined, house and support the Customer Host Environment.

(l)     **"Hosting Service Technician"** shall mean an individual within ASI that is responsible for performing Hosting Service functions for ASI Customers.

(m)     **"Level 1"** shall mean the type of question that can be addressed by either a Help Desk Analyst or a Product Specialist.

(n)     **"Level 2"** shall mean the type of question that can be addressed by a System Administrator.

(o)     **"Level 3"** shall mean the type of question that can be addressed by a Technical Support Analyst.

(p)     **"Level 4"** shall mean the type of question that can be addressed by a Software Developer.

(q)     **"Product Specialist"** shall mean an individual within ASI that is also responsible for answering complex Advanced Help Desk calls.

(r)     **"Scheduled Hosting Outages"** shall mean pre-arranged periods of time where the Customer Host Environment will be offline to enable ASI Hosting Service Technicians to perform routine hardware and software preventive maintenance as well as activities associated with backing up and protecting the Customer Host Environment and Customer Data.

(s)     **"Severity 1"** shall mean a major problem that prevents one or many Users from using the Customer Application.  The target response time for this type of problem is two (2) consecutive business hours.

## Master Subscription Services Agreement
## Appendix B 1-4
## Subscription Services Addendum

(t)  "**Severity 2**" shall mean a moderate problem that hinders one or many Users from using the Customer Application. In this instance, the individual can continue to work or may be given a way in which they can continue to work until such time that a more permanent solution can be found. The target response time for this type of problem is eight (8) consecutive business hours.

(u)  "**Severity 3**" shall mean a minor problem that is considered to be a nuisance and does not seriously impact using the Customer Application. The target response time for this type of problem is (16) consecutive business hours.

(v)  "**Severity Level**" shall mean either Severity Levels 1, 2 or 3.

(w)  "**Software Developer**" shall mean an individual within ASI that is responsible for modifying and enhancing the Customer Application.

(x)  "**Systems Administrator**" shall mean an individual within ASI that is responsible for managing the operational environment for the Customer Application.

(y)  "**Technical Support Analyst**" shall mean an individual within ASI that is responsible for providing advanced Customer Application support.

**3    Points-of-Contact.**

(a)  <u>Customer</u>.   Jack Dempsey
Senior Project Manager
Commercial Business Application Services
1 University Drive, Suite 500
Princeton, NJ 08540

Phone: (609) 524-6867
Fax:     (240) 514-3967

(b)  ASI.          Randy Bennett
Director, Support Services
ASI Business Solutions, Inc.
2200 Renaissance Blvd.
King of Prussia, PA 19406

Phone: (610) 265-9400
Fax     (610) 265-4100

**4    Responsibilities.**

(a)  <u>Customer</u>.

(i)    Customer shall assign a single point of contact (Project Manager) for all technical and operational communications and to manage change order control. The Project Manager must be fully acquainted with Customer's information technology systems and processes.

(ii)   Customer shall provide laptop/tablet computer(s) (one for each Sales Force) that can be used by ASI for the purposes of image unit and system testing, problem diagnosis and resolution.

## Master Subscription Services Agreement
## Appendix B 1-4
## Subscription Services Addendum

    (iii)   Customer shall provide an Apple iOS® device (one for each Sales Force/device combination) that can be used by ASI for the purposes of image unit and system testing, problem diagnosis and resolution.

  (b)  <u>ASI</u>.

    (i)   ASI shall assign a single point of contact (Program Manager) for all technical and operational communications and to manage change order control to/from Customer.

    (ii)   ASI shall staff the project with personnel having the necessary skills and experience to complete the services in accordance with the Scope of Services stated herein.

    (iii)   ASI Program Manager shall communicate problem areas immediately to the Customer Program Manager and define joint actions required to ensure successful service delivery.

    (iv)   ASI shall provide these services out of their US based facilities.

**5**    <u>**Scope of Services.**</u>

If Customer has paid all related Subscription Fees, ASI will provide a sufficient number of qualified staff to successfully perform the services listed in **Table 1 – Subscription Services Coverage Hours,** during the Coverage Hours specified therein:

### Table 1 – Subscription Services Coverage Hours

| Subscription Service | Coverage Hours * |
|---|---|
| Environment Hosting | 24 Hours/Day, 365 Days/Year |
| System Operations | 9:00 AM – 5:00 PM, ET, M-F |

\* National holidays of the United States are excluded from Coverage Hours.

Each of the above Subscription Services and their method of access are described in greater detail below.

  (a)  <u>Access; Process</u>:  The method for accessing any of the above Subscription Services is defined below:

    (i)   Customer will place calls to the ASI telephone support line assigned to the Customer so that the issue can be classified, routed and tracked.  In the event the line is busy or that the call is received outside of the Coverage Hours, then the call will be forwarded to an ASI Help Desk voice mailbox assigned to the Customer.

    (ii)   All such calls are initially classified Level 1 and routed to a Help Desk Analyst or Product Specialist depending on the nature and difficulty of the problem.

    (iii)   The Help Desk Analyst or Product Specialist will use their reasonable efforts to address and resolve the issue in accordance with the Severity Level assigned to the problem by ASI in its sole discretion.

## Master Subscription Services Agreement
## Appendix B 1-4
## Subscription Services Addendum

(iv) If the Help Desk Analyst or Product Specialist cannot resolve the issue, it will be routed to the appropriate resource (Hosting Service Technician, Product Specialist, Systems Administrator or Technical Support Analyst) based on the Severity Level of the issue as well as the type of service the Customer has purchased.

(v) If the Customer does not have the requisite ASI services needed to address the issue, then the Customer can either nominate an internal point of contact or request that ASI perform the function on a first come first serve basis at ASI's then current Professional Service rates pursuant to a Professional Services Agreement between the parties.

(vi) All calls will continue to be escalated until a resolution and/or workaround has been identified and implemented.

(vii) The Customer will be notified in advance if it is necessary to implement a workaround solution.

(viii) All calls will be logged and tracked using an ASI internal system.

(b) <u>Hosting Service</u>:

(i) Controls physical security (carded/biometric access) to the Customer Host Environment.

(ii) Monitors environmental facilities (e.g., space, air-conditioning, heating, lighting, cabling, uninterruptible power supply, etc.) to properly house and permit the Customer Host Environment to operate within normal specifications and tolerances.

(iii) Electronic monitoring of site availability (hardware, software and communications).

(iv) Log and track all outages using an ASI internal system.

(v) Perform daily, weekly and monthly backups.

(vi) Execute disaster recovery procedures (hardware, software or data) in the event they are needed.

(vii) Install, test and put into production, applicable operating system patches to ensure that all servers remain current with critical security updates and service packs recommended by the manufacturer.

(viii) Error resolution and notification.

(c) <u>System Operations</u>:

(i) Manage the test and production Customer Application environments (comprised of various applications and data servers).

(ii) Customer user security and administration, user group administration and data security.

## Master Subscription Services Agreement
## Appendix B 1-4
## Subscription Services Addendum

    (iii)    Accept and process changes to existing data source volumes e.g., product/market changes to sales data (e.g., Rx and $'s), alignment changes, new detail products, new sample products, new targets/ratings.

    (iv)    Integrate unlimited report template changes that have been made by Customer personnel.

    (v)    On a weekly basis load Customer data, perform data quality control, move Customer data to production and data slicing processes.

    (vi)    Monitoring disk(s) space, performance and availability of the Customer Application platforms and environment.

    (vii)    System installation and integration support (client and server).

    (viii)    Error resolution and notification.

    (ix)    Coordinate system updates of the Customer solution with the end user community.

**6**    **Term, Subscription Fees, Payment Schedule and Assumptions.**

    (a)    <u>Term</u>:

        (i)    This Appendix B 1-4 shall commence on January 1, 2013, and shall end on December 31, 2017 (the "Term").

        (ii)    Upon expiration or termination of this Appendix B 1-4, Customer shall cease using and accessing the Subscription Service and promptly return the same to ASI.

    (b)    <u>Early Termination Option</u>:

        (i)    ASI agrees to provide the Customer with an early termination option for the purposes of dealing with business uncertainties in 2016 through 2017. Notwithstanding anything contained to the contrary in the Master Agreement, this option is subject to the following conditions and terms and any such early termination will not become effective unless the same are satisfied in full:

            1.    The option cannot be exercised before January 1, 2016.

            2.    A six (6) month advanced notification is required prior to the effective termination date (e.g., to terminate effective January 1, 2016, written notice must be received by ASI no later than July 1, 2015).

            3.    An accelerated early termination fee will be due and payable from the point of termination through December 31, 2017 (in lieu of the fees that would have been due and payable had this Appendix not been terminated prior to the end of the Initial Term). The entire early termination fee will be due upon invoice receipt and calculated using the following formula:

## Master Subscription Services Agreement
### Appendix B 1-4
### Subscription Services Addendum

**Early Termination Fee** = (40% of the fees due on the undelivered portion of the 2016 services -- as if the Appendix were not terminated early) + (50% of the fees due on the undelivered portion of the 2017 services that would have been delivered - assuming for this purpose full performance thereof - had the Appendix not been terminated early).

By way of example, if notice is given on February 1st, 2016 then the effective termination date would be August 1st 2016 and the fees due would be 40% of the remaining five (5) months of possible service for 2016 plus 50% of the entire fee due for all of 2017.

(ii)   Except as otherwise expressly provided in this Section, all of the terms and conditions contained in the Master Agreement in respect to termination of this Appendix shall be and remain in full force and effect.

(c)   <u>Subscription Fees and Payment Schedule</u>:

(i)   ASI's Subscription Fees and Payment Schedule are as follows:

### Subscription Fees & Payment Schedule

| Subscription Fee Description | Payment Due Date | Payment Amount |
|---|---|---|
| Additional 370 Customer Specific Viewer & iOS Edition Users | Jan 1, 2013 | $523,679.50 |
| Additional 370 Customer Specific Viewer & iOS Edition Users | Jan 1, 2014 | $523,679.50 |
| Additional 370 Customer Specific Viewer & iOS Edition Users | Jan 1, 2015 | $523,679.50 |
| Additional 370 Customer Specific Viewer & iOS Edition Users | Jan 1, 2016 | $523,679.50 |
| Additional 370 Customer Specific Viewer & iOS Edition Users | Jan 1, 2017 | $523,679.50 |

(ii)   The cost per user for the Customer Specific Premium, Viewer and iOS Editions for 1,001 up to 1,500 users is $1,415.35

(iii)   Invoices for Subscription Fees will be submitted on an annual basis, in advance of the commencement of such calendar year.

(d)   <u>Assumptions</u>:

(i)   Changes to the Scope of Services listed in this Appendix B 1-4 will result in a need for ASI to allocate additional resources. In such event, ASI shall submit a written request to Customer reflecting the actual increase in expenses resulting from the changed circumstances.

(ii)   All project scope changes will be submitted in written form using the standard ASI Change Request Form. If changes occur after the initial estimates are established, then the resulting difference, if any, will be invoiced in accordance with the approved ASI Change Request Form.

(iii)   Subscription Fees quoted and referenced are in US Dollars.

## Master Subscription Services Agreement
## Appendix B 1-4
## Subscription Services Addendum

(iv)  Subscription Fees quoted do not include sales tax or any other government related fees and are the responsibility of the Customer and will not be paid or collected by ASI.

(v)  Subscription Fees quoted do not include cost for ASI travel and related project expense(s), as necessary.

(vi)  All Customer approved travel and related project expense(s) will be billed at cost.

(vii)  All pre-approved related travel expense(s) will be billed as they are incurred.

(viii)  All pre-approved related project expense(s) will be billed on the 1st of the month and payable upon receipt.

**7**  **Access Apps.**

ASI will provide the applicable services under this Appendix B 1-4 with respect to Access Apps; provided however, that in the event that an Access App is determined by ASI to require a patch, fix or other update in order to address an issue with respect to its functionality or availability, such patch, fix or other update is subject to the approval and availability policies of the applicable third party provider of the same through which such patch, fix or other update must be offered to its users. Accordingly, ASI shall not be responsible or liable in any manner whatsoever under this Appendix B 1-4 or otherwise for any delay or failure to make available any such patch, fix or other update by such third party provider.

**8**  **Term.**

This Appendix shall begin on January 1, 2013 and extend through January 31, 2017 unless modified in writing between both parties.

**9**  **Budget.**

The total contract value of this Appendix shall not exceed TWO MILLION SIX HUNDRED EIGHTEEN THOUSAND THREE HUNDRED NINETY SEVEN DOLLARS FIFTY CENTS ($2,618,397.50) unless modified in writing by both parties.

# AMENDMENT NO. 1 TO TASK ORDER NO. 1
#

This Amendment No. 1 to the November 1, 2010 Task Order No. 1, agreement database number 1065024 ("Agreement") is by and between Otsuka America Pharmaceutical, Inc. ("OAPI") and ASI BUSINESS SOLUTIONS, INC, ("ASI").

**WHEREAS,** the parties wish to amend the terms of the Agreement;

**NOW THEREFORE,** the parties agree as follows:

1. Budget
   The Budget of the Agreement is hereby increased by $2,618,397.50 USD. The total value of the Agreement is hereby changed to $4,688,397.50 USD.

2. Term
   The Term of the Agreement is hereby extended and shall end on January 31, 2017.

3. Proposal
   The terms of the Agreement are modified as described in Schedule A, attached hereto.

4. Subscription Service Index
   The terms of the Subscription Service Index is hereby modified as described in with Appendix B 1-4, Subscription Services Addendum, attached hereto.

   OAPI hereby subscribes to the following Subscription Service(s):

| APPENDIX | DATE |
|---|---|
| þ Appendix B 1-4, Subscription Services Addendum | January 1, 2013 |
| þ Environment Hosting | |
| þ         System Operations | |

Except as provided herein, all other terms and provisions of the Agreement remain unchanged and in full force and effect.

**IN WITNESS WHEREOF** the parties have electronically signed this agreement using the Emptoris Enterprise Contract Management system as of the dates listed below:

Contract number: 20130187

**Otsuka America Pharmaceutical, Inc.**

Digital signature code:


Name: Steven Weisel

Title:

Date: 1/25/2013

**ASI Business Solutions, Inc.**

Digital signature code:

MCwCFFrf1lTcTqpX2iN1Z7rJhmgfvS51AhRh1fSJYicx+i2nu3n/VIc5ySjKUA═

Name:David Menzies

Title: Authorized Representative

Date: 1/24/2013

# EXHIBIT "E"



Otsuka-people creating new products for better health worldwide

September 26, 2016

Mr. David Menzies
Vice President, Global Technology Services
ASI Business Solutions, Inc.
2200 Renaissance Blvd,
King of Prussia, PA 19406

Re:     Certification of ASI Data Destruction

Dear Mr. Menzies,

Per the contract termination requirement, Appendix B 1-3, Section 6(a)(iii), the undersigned affirms that Otsuka
America Pharmaceutical, Inc. (OAPI) has ceased using and accessing the Subscription Service.  OAPI further
affirms that it has used reasonable business efforts to confirm removal of any ASI Confidential Information,
including Intellectual Property.

The terms of the Master Subscription Services Agreement and Master Professional Services Agreement (the
MSAs) dated November 1, 2010, remain unchanged by this certification.

Otsuka America Pharmaceutical, Inc.

By:          Thomas Dannenbrink

Signature:

Title:       Sr. Director, Sales Operations

Date:        September 26, 2016

EXHIBIT "F"



**Ryan J. Udell**

1650 Market Street | One Liberty Place, Suite 1800 | Philadelphia, PA 19103-7395
Direct 215.864.7152 | Fax 215.789.7653
udellr@whiteandwilliams.com | whiteandwilliams.com

October 3, 2016

Via FedEx

R. Monica Hennessy, Esquire
Otsuka Pharmaceutical Development & Commercialization, Inc.
508 Carnegie Center
Princeton, New Jersey 08540

RE:  **OBLIGATIONS UNDER THE ASI SUBSCRIPTION
SERVICES AGREEMENT ("AGREEMENT")**

Dear Ms. Hennessey:

As you may recall from our phone conversations at the end of last year, this Firm represents ASI Business Solutions, Inc. ("ASI") in connection with, among other things, issues relating to the above Agreement and its termination.  I understand from my client that Otsuka has refused to sign and return documentation that is required to be delivered to ASI under the Agreement, despite numerous requests from ASI personnel.  Rather, Otsuka delivered its own certification that does not comply with the Agreement.  I also understand that, contrary to what has been asserted by Otsuka in such non-compliant certification, Otsuka personnel continue to use ASI's software as ASI continues to receive access requests (approaching 100 such requests) to the system from various Otsuka devices on which ASI software is installed.

Section 10(e) of the Agreement requires Otsuka, upon ASI's written request, to either return all ASI Confidential Information or destroy such Confidential Information and deliver to ASI written certification certifying the destruction of such Confidential Information signed by an officer of Otsuka.  Pursuant to Section 10(a) of the Agreement, Confidential Information expressly includes all materials and information relating to ASI's products and services.  Additionally, the Agreement (and appendices) provide that after termination of the Agreement Otsuka cannot continue to use any of ASI's products and services (See, e.g., Section 8(a)(iii) of Appendix A 1-3, Section 6(a)(iii) of Appendix B 1-3, and Section 6(a)(ii) of Appendix B 1-4).

As it is clear that Otsuka (i) has the obligation to certify that all of ASI's Confidential Information has been destroyed on ASI's request and (ii) has failed to comply with ASI's requests, and as Otsuka and its personnel continue to use ASI's products and services following termination, Otsuka is in breach of the Agreement and such breach has resulted and will continue

Delaware | Massachusetts | New Jersey | New York | Pennsylvania | Rhode Island

17862546v.2

R. Monica Hennessy, Esquire
October 3, 2016
Page 2

to cause significant and substantial damages and irreparable harm to ASI, particularly since Otsuka has ongoing access to and use of the portion of ASI's software applications that reside on Otsuka computers and other devices.

ASI's concerns and ongoing damages are well founded, particularly since this is not the first time that Otsuka has materially breached the Agreement. I understand from ASI that in 2014 Otsuka requested permission for one of its consultants, Mu Sigma, to use ASI's software on behalf of Otsuka and that ASI granted Mu Sigma, upon the express condition that access would be limited to installing ASI's software on and accessing ASI's services from Otsuka computers located in the United States only. Instead, Otsuka authorized and permitted Mu Sigma to install its software on and access ASI's services from India, in direct violation of such limited permission and the Agreement, as ASI identified repeated access to its system by Mu Sigma personnel in India. Mu Sigma, as you may know, is a direct competitor of ASI and presumably acting under the color of Otsuka had improper and possibly illegal prolonged access to ASI's most valuable assets, its software. Such access was in clear violation of the limited permission granted by ASI and the Agreement, and while Otsuka eventually advised ASI that ASI's software had been removed from all Mu Sigma access points, given Otsuka's blatant disregard for ASI's intellectual property, as evidenced by Otsuka's continued use thereof despite its assertions to the contrary, ASI strongly suspects that its most valuable asset is still in the possession of one of its competitors.

Accordingly, ASI hereby demands that Otsuka immediately complete and return to ASI the enclosed certification and accompanying worksheet. In the event that ASI does not receive this completed and signed documentation by Friday, October 7, 2016, ASI may, without further notice, exercise its available rights and remedies under the Agreement and at law to protect its interests. If ASI were forced to do so, note that as set forth in Section 15(c) of the Agreement, ASI would be entitled to be reimbursed by Otsuka for its attorneys and costs in addition to all other damages that it has incurred.

We expect that you will promptly comply with ASI's demands.

Very truly yours,

WHITE AND WILLIAMS LLP

Ryan J. Udell

RJU:dhm

cc:   Jim Alonso, CEO of ASI Business Solutions, Inc.

17862546v.2